# CASES

### ARGUED AND DETERMINED

#### IN THE

# SUPREME COURT OF ILLINOIS.

### JULIA BURLEY

*v*

### MARY A. McGOUGH.

*Filed at Ottawa November 14, 1885.*

1. EVIDENCE *as to mental capacity—opinions of experts—of their weight, as against evidence of a different character.* A person aged about seventy-three years, made his will on the 7th of March, 1883, and died on the 12th of the same month. On a contest of the will, a physician testified that he saw the testator on the 3d, 6th and 9th days of March, 1883, and stated that the testator was physically very weak, and did not think he was able to walk; that he was the same as a man in a dying condition, and that he did not think any man in his condition was capable of transacting ordinary business. On the other hand, it was shown that on the 3d of March the testator walked three blocks to a barber shop, and got shaved, and that up to two days before his death he arose from his bed every morning to admit a neighbor, and kept up the fire, and walked around the room, and went into the kitchen, and was capable of attending to his business affairs, and dictated his will without any breaks in his directions or conversations. Other physicians were called as experts, and gave their opinions that he was not capable of making a will, based on the statements of the first named physician: *Held,* that such mere opinions of witnesses as experts, founded on such a basis, were entitled to but little weight as against proof of facts showing mental capacity.

2.   The testimony of witnesses, neighbors of a testator, consisting of facts and circumstances, and a detail of what he actually did and said, showing his mental competency, with their opinions based upon such facts, is proper, and entitled to much greater weight than the opinions of witnesses not based on facts and actual observation, on the question of his capacity to make a will.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. JOHN BURNS, Judge, presiding.

Mr. GEORGE B. FOSTER, for the plaintiff in error:

The introduction of the will, with its probate, made a *prima facie* case, and shifted the burden of proof to show mental incapacity, upon the complainants.   *Holloway* v. *Galloway*, 51 Ill. 159.

Mere weakness of understanding is not of itself sufficient to invalidate a will, if the testator is capable of understanding the subject.   *Abraham* v. *Wilkins*, 17 Ark. 202; *Weir* v. *Fitzgerald*, 2 Brad. (N. Y.) 42; *Elliott's will*, 2 J. J. Marsh. 340.

It is not necessary that the testator, at the time of making the will, should be capable of managing business generally, if he understands what he is then doing.   *Kinne* v. *Kinne*, 9 Conn. 102; *Stubbs* v. *Houston*, 33 Ala. 555.

A man will be held to have had capacity to make a will, if he understood what he was about when he made and executed it; that he had a family, (if such was the case,) and the relations in which he stood to it, and that he had property, and what it was, and had a desire to bequeath his property as it is disposed of.   *Cordrey* v. *Cordrey*, 1 Houst. 269; *Hall* v. *Hall*, 18 Ga. 40; *Convers* v. *Convers*, 21 Vt. 168; *Hawthorne* v. *King*, 8 Mass. 371.

Mr. GEORGE A. WILSON, and Messrs. PUTERBAUGH & PUTERBAUGH, for the defendant in error, discussed the evidence of the witnesses at some length, bearing upon the mental capacity of the testator.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was a bill in chancery, filed by Mary A. McGough, against Julia Burley, to set aside the last will and testament of Cornelius Powell, deceased. The will was made March 7, 1883, by which the testator gave to said Mary A. McGough five dollars, only, to his wife $500, and to his step-daughter, said Julia Burley, the residue of his property. On March 12, 1883, five days after the making of the will, the testator died, aged about seventy-three years.

It appears that Cornelius Powell had for many years been a resident of Peoria, and was twice married. Mary A. McGough was his daughter, and by his first wife, and his only child. His first wife died many years ago. Some twenty years prior to testator's death, his daughter, Mary A. McGough, was married, left her father's house and went to the State of New York, where she has ever since resided. Some years before his death testator married one Catharine Powell, (who was the mother of Julia Burley,) and lived with her up to the time of her death. The said Catharine appears to have become disabled and crippled, and the evidence shows her to have been confined to her bed, and that during the last sickness of the testator he and his wife were cared for by Julia Burley, who brought to them their daily food from her own house. The amount of the estate left by the testator does not appear, further than that the will describes the lot devised to Julia Burley, viz: lot 3, in block 9, in Brotherson's addition to the city of Peoria, as being all his real estate, and it might be inferred there was not very much property besides, from the mode of living of testator and his wife, shown by the evidence, and the want of money having been assigned as the reason for not employing help to take care of him and his wife.

Under the bill an issue of fact was submitted to a jury, as to whether or not the alleged will was the last will and tes-

tament of Cornelius Powell, deceased.    The jury found that it was not.    A motion for a new trial was overruled, and a decree entered, in accordance with the finding, for the complainant, and the defendant brings this writ of error.    The ground of attack on the will is, that the testator was not of sufficient mental capacity to make a will.

On the trial, Dr. Stewart was called as a witness for the complainant, who testified that he visited the testator professionally on the 3d, 6th and 9th of March, 1883, during his last illness, and after a particular description of his physical condition, stated testator was weak physically; did not think he could walk, but might, possibly, two or three steps; that he was much the same as any man in a dying condition; that he judged his mental from his physical condition; did not think any man in that state capable of transacting business,—of making a will; that his reasons were, that body and mind are internally connected,—that when the body is dissolved the mind is gone.    Yet, notwithstanding the witness' opinion of the physical condition of the testator, and from which he judged his mental condition, the proof shows that on that very 3d day of March, when the witness made his first visit, the testator actually walked some three blocks to a barber's shop and got shaved, and that during all the intervening time, to a couple of days before his death, on the 12th of March, he got up every morning and went to the door and opened it, to admit a neighbor woman who attended to his room; that he went from his bed to the stove and put in coal; walked around his room; would go out into the kitchen, and out on the porch.    An array of seven other physicians, none of whom had seen the testator in his sickness, was produced, and a hypothetical question was propounded to them as to what would be the mental condition of the testator upon the hypothesis of his physical condition being as described by the witness Stewart, and they generally answered that the mind would correspond with the body, and testator would not

have mental capacity to transact ordinary business. Such mere opinions of witnesses, as experts, founded on such a basis, are entitled to but little weight, as against proof of facts which show mental capacity. All the other testimony on complainant's part consisted mostly of opinions of witnesses not resting on facts, on what the testator did or said, and they not appearing to be deserving of much consideration as opinions.

The evidence on the part of the defendant was of a very different character, not being principally opinions, but consisting in facts and circumstances, a detail of what the testator actually did and said, showing his mental competency, with opinions based upon such facts. Mr. Yates, who drew the will, who was county judge of Peoria county, and had been for seventeen years, testifies that having been sent for by the testator, he came to his house. The testator said he wanted him to draw his will; that the testator first told him what he wanted in the will, and then the witness sat down and wrote it. Testator said he wanted $500 to go to his wife; that he had a daughter who had been absent nineteen years; that she had not assisted him in making the property, and that he would give her the sum named in the will to remember him by; he said Mr. or Mrs. Burley had helped him a great deal, and would take care of the "old woman;" that testator gave him the description of the lot by the number of the lot, block, and the name of the addition, from memory, while witness was writing the will; that testator did not fall asleep or have to be aroused while witness was there; that he made no break in his conversation about the will or any thing else, that witness observed; that while he was there testator got up and moved around the room without assistance. This was on the 7th of March, and the will was executed on that day.

The witness O'Brien was at testator's house the last six or seven days before his death, all the while, day and night,

feeding his hogs and doing his "chores" about the house. He testifies that they talked frequently together, and testator told him what he wanted done, and he did it for him; that he told witness several times, during the last week of his life, that he must get rid of a sow that he had, as it would not pay to keep her, and that on March 10 testator sold the hog to the butcher; that the testator could walk around the room until the day before he died; that he went into the kitchen and out on the porch a great deal; that a great many neighbors came in every day, and testator knew every one, and would talk with them.

The witness Holbran was at testator's house every day for two weeks before his death; she usually went there about seven o'clock A. M.; testator got up and opened the door for her every morning except the last two; she would make the beds and mop the floor; talked with the testator frequently; he put the coal on and kept up the fire until the last day or two before he died. Particulars of conversations had with the testator by the last two and a great number of other witnesses, neighbors who called in to see the testator, are testified to by all such witnesses, showing the conversations on his part to be entirely rational, and they all concur in saying that he talked as sensibly as before he was sick.

Father W. A. Bock testified that he was a Catholic priest, and was called to attend testator in his last illness, and saw him on the 6th, 7th and 9th of March; was with him about a quarter of an hour each time, and talked with him each time about religious matters; that the first time, they went into the kitchen, to be alone; testator had no assistance in walking; he saw nothing wrong with his mind; that it was a part of his business to know whether his mind was right or not; that he went to administer the last rites of the church, and it would have been wrong to have administered such rites to him if his mind was not sound, and he would not have done so.

. There is much testimony of many other witnesses on the part of the defendant, who either cared for the testator or called in to see him in his last illness, giving particulars of conversations had with him showing soundness of mind, with their concurring opinions thereof.

Without going further into details of facts and circumstances showing soundness of mind, testified to by many other witnesses, we will say that the testimony all considered leaves no doubt in our minds of the testamentary capacity of Cornelius Powell, the testator, and we are of opinion the verdict was clearly against the weight of evidence, and should, for that reason, have been set aside.

The decree will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*