(March 6, 1897.)

## KELLY v. PERRAULT.

[48 Pac. 45.]

PLEADING UNDUE INFLUENCE.—The facts constituting undue influence, like those constituting fraud, must be pleaded; it not being sufficient to aver undue influence, which is a legal conclusion.

MENTAL CAPACITY—WHEN COMPETENT TO TRANSACT BUSINESS.—A grantor who has mental capacity sufficient to understand ordinary business transactions at the time of the *factum,* and understands the motive and effect of the deed which he makes, knows what property he is conveying and to whom it is being conveyed, is competent to make such deed.

FRAUD—UNDUE INFLUENCE.—The act of inducing one who has not sufficient mind to know what he is doing to sign a deed, while an actual fraud, does not constitute undue influence.

SAME—HOW PROVEN.—Undue influence is proven by showing that a person who has mental capacity to understand, and does understand, what he is doing, is impelled by artifice, force or fear to do, what he does not want to do, and what he would not otherwise do but for such influence.

IMPEACHING DEED.—Declarations of a grantor made long prior to his
deed, and inconsistent therewith, are not admissible for the pur-
pose of impeaching such deed.

WEIGHT OF EVIDENCE.—The evidence of subscribing witnesses to a deed,
and of persons who are familiar with the grantor and the transac-
tion involved, are entitled to great weight, while the opinion of
an expert witness is entitled to but little weight as against such
evidence.

HYPOTHETICAL QUESTIONS TO WITNESS.—A hypothetical question pro-
pounded to an expert witness should be predicated upon facts
proven as facts which the evidence in the particular case tends
to establish, and not upon conjecture.

INSTRUCTIONS.—Alleged errors of a trial court in an equity case, in
giving or refusing to give instructions to a jury called to assist
the court, are immaterial and will not be reviewed on appeal.
The propriety of giving instructions in such case is doubtful.

EQUITY PRACTICE.—Issues of fact in an equity case are properly pre-
sented to the jury by interrogatories; but there should be only
one series of interrogatories in such case, and such interrogatories
should cover the material questions in dispute.

(Syllabus by the court.)

APPEAL from District Court, Ada County.

George Ainslie and W. E. Borah, for Appellants.

The evidence of an officer or notary public or subscribing wit-
nesses is entitled to peculiar weight, and is conclusive in the
absence of clear and satisfactory evidence to the contrary.
(*Massay v. Huntington*, 118 Ill. 80, 7 N. E. 269; *Buckey v.
Buckey*, 38 W. Va. 168, 18 S. E. 383.) The rule in this class of
cases is, Had the contracting party sufficient mental capacity to
reasonably understand the value and effect of what he was do-
ing? (*Trimbo v. Trimbo*, 47 Minn. 389, 50 N. W. 350; *Aiman
v. Stout*, 42 Pa. St. 114.) A man is capable of deeding his prop-
erty if he is capable of transacting ordinary business, settling ac-
counts, etc. (*Frances v. Wilkinson*, 147 Ill. 370, 35 N. E. 150;
*Meeker v. Meeker*, 75 Ill. 260; *Freeman v. Easley*, 117 Ill. 317, 7
N. E. 656.) It is not necessary that the grantor should compre-
hend his deed in legal form, or be able to go entirely through the
matter without prompting. (*Trish v. Newell*, 62 Ill. 197, 14 Am.
Rep. 79; *Carpenter v. Calvert*, 83 Ill. 62.) Although a mind
may be impaired, affected by dementia, yet if the party under-
stands the nature of his act it is sufficient. (*Pickeral v. Morris*,
97 Ill. 220; *Stone v. Millburn*, 83 Ill. 105; Redfield on Wills,

98-100; *English v. Porter,* 109 Ill. 285.)    The fact that a party
is physically incapable of looking after his property, or that his
mind is enfeebled by age or disease, will not render him incap-
able of deeding his property. (*Argo v. Coffin,* 142 Ill. 368, 34
Am. St. Rep. 86, 32 N. E. 679; *Whitney v. Twombly,* 136 Mass.
145.)    As to the weight of the physician's testimony as against
those personally acquainted with the party and the transaction,
see *Rutherford v. Morris,* 77 Ill. 397; *Burley v. McGough,* 115
Ill. 11, 3 N. E. 738.    Fraud or undue influence must be directly
connected with the execution of the instrument.    It must be a
moving power at the time the instrument is executed.    (*Ruther-
ford v. Morris,* 77 Ill. 399; *Guild v. Hull,* 127 Ill. 523, 20 N. E.
665; *Reichenbach v. Ruddach,* 127 Pa. St. 564, 18 Atl. 432.)
Influence through affection, etc., will not avoid a deed. (*Burt v.
Quisenberry,* 132 Ill. 385, 24 N. E. 622; *Children's Aid Soc. v.
Loveridge,* 70 N. Y. 387; *Hale v. Cole,* 31 W. Va. 576, 8 S. E.
516; *Nichols v. Kerr,* 20 W. Va. 252; *Coit v. Patchen,* 77 N. Y.
533.)    Undue influence must not be the influence of attach-
ment, affection, etc., and must amount to force or coercion.
(*Goodwin v. Goodwin,* 59 Cal. 561; *Howe v. Howe,* 99 Mass. 88;
*Carpenter v. Bailey,* 94 Cal. 406, 29 Pac. 1102.)    Undue in-
fluence must destroy the will of the grantor completely, take
away his wishes and thwart his purposes.    (*Marx v. McGlin,* 88
N. Y. 357.)    Unequal division of the property gives rise to no in-
ference against the validity of the deed.    (*Freeman v. Easley,*
117 Ill. 317, 7 N. E. 657; *Horn v. Pullman,* 72 N. Y. 269, 276.)
The grantor may favor his children one against the other.
(*Cleomater v. Kinster,* 43 Ill. 272; *Rutherford v. Morris,* 77 Ill.
377; *Hill v. Nash,* 41 Me. 585, 66 Am. Dec. 266-267; *Jackson v.
King,* 4 Cow. 207, 15 Am. Dec. 354, and note; 27 Am. & Eng.
Ency. of Law, 489; *Sanfley v. Jackson,* 16 Tex. 584; *Jenkins v.
Pye,* 1 Pet. (U. S.) 241; *Millican v. Millican,* 24 Tex. 446; *Mu-
loch v. Muloch,* 31 N. J. Eq. 394; *Leddel v. Starr,* 20 N. J. Eq.
274; Pomeroy's Equity Jurisprudence, sec. 962.)    The terms
"confidential relations" and "fiduciary relation" are convertible
terms in legal parlance.    (*Robbins v. Hope,* 57 Cal. 493; *Guild
v. Hall,* 127 Ill. 523, 20 N. E. 665; *Brownfield v. Brownfield,*
43 Ill. 148.)    It will be seen by reference to the court's instruc-

tion, given of his own motion, that he did not instruct them as to the burden of proof at all. We were entitled to a clear instruction upon this proposition. The burden in this case was upon the plaintiffs. (*English v. Porter*, 109 Ill. 285.) Indefinite, uncertain and contradictory findings will not sustain a judgment. (*Gilman v. Curtis*, 66 Cal. 116, 4 Pac. 1094; *Learned v. Castle*, 78 Cal. 454, 18 Pac. 872, 21 Pac. 11.)

Hawley & Pockett, for Respondent.

The supreme court of Idaho territory, in *Mootry v. Hawley*, 1 Idaho, 543, laid down the rule that the appellate court would not disturb a judgment or verdict, or order denying a new trial, where there is a substantial conflict of testimony; and this rule has been followed in a long line of decisions of this court. (*Ainslie v. Printing Co.*, 1 Idaho, 64; *Black v. City of Lewiston*, 2 Idaho, 276, 13 Pac. 80.) A deed by one in a weak state of mind, to one who sustains confidential relations toward him, and where there is no consideration, will not be upheld, as undue influence will be presumed. (*Allore v. Jewell*, 94 U. S. 506; *McFadden v. Vincent*, 21 Tex. 47; *McCraw v. Davis*, 2 Ired. Eq. (N. C.) 618; *Hale v. Brown*, 11 Ala. 87; *Graves v. White*, 4 Baxt. (Tenn.) 38; *Griffith v. Godey*, 113 U. S. 89, 5 Sup. Ct. Rep. 383; *Conley v. Nailor*, 118 U. S. 133, 6 Sup. Ct. Rep. 1001; *Moore v. Moore*, 56 Cal. 89; *Keeble v. Cummins*, 5 Hayw. (Tenn.) 43; *Gates v. Cornett*, 72 Mich. 420, 40 N. W. 740; *Wilkinson v. Sherman*, 45 N. J. Eq. 421, 18 Atl. 228.) Where confidential relations exist between the donor and donee, a gift obtained by the person standing in such relation is *prima facie* void, and the burden of proof is thrown on the donee to show that the gift was the free, voluntary and unbiased act of the donor. (8 Am. & Eng. Ency. of Law, 1310-1312, and note 2; *Ford v. Hennessy*, 70 Mo. 580; *Todd v. Grove*, 33 Md. 188; *Woodbury*, 141 Mass. 329, 55 Am. Rep. 479, 5 N. E. 275.) As to the question of undue influence: *In re Sprat's Will*, 32 N. Y. Supp. 1092, 11 Misc. Rep. 218; *In re Nolte's Will*, 32 N. Y. Supp. 226, 10 Misc. Rep. 608; *In re Graf's Will*, 31 N. Y. Supp. 682, 10 Misc. Rep. 293; *Smith v. Smith*, 67 Vt. 443, 32 Atl. 255; *Rivard v. Rivard*, 109 Mich. 98, 63 Am. St. Rep. 566, 66 N. W. 681; Devlin on Deeds, sec. 84. When a foundation has

been laid by evidence tending to show unsoundness of mind, the previously declared intentions of testator are admissible to show the deed is the result of imposition. (*Howe v. Howe,* 99 Mass. 88-91; *In re Goldthorpe's Estate,* 94 Iowa, 336, 58 Am. St. Rep. 400, 62 N. W. 845; *Garland v. Smith,* 127 Mo. 567, 28 S. W. 191, 29 S. W. 836; *In re Ely's Estate,* 16 Misc. Rep. 228, 39 N. Y. Supp. 177.) Before instructions claimed to be erroneous, can be considered in this court, there must be: 1. A special and specific objection made to each instruction by number, and exception taken in the same manner, and that a general objection is insufficient; 2. That the grounds of the objection and exception must be specially and distinctly expressed. (*Black v. City of Lewiston,* 2 Idaho, 276, 13 Pac. 80; *Griswold v. Boley,* 1 Mont. 545; *Gum v. Murray,* 6 Mont. 10, 9 Pac. 447; *Haak v. Struve,* 38 Kan. 326, 16 Pac. 686; *Bard v. Elston,* 31 Kan. 274, 1 Pac. 565; *State v. Wilgus,* 32 Kan. 126, 4 Pac. 218; *McFeters v. Pierson,* 15 Colo. 201, 22 Am. St. Rep. 388, 24 Pac. 1076; *Cockrill v. Hall,* 76 Cal. 192, 18 Pac. 318; *Jacobs v. Mitchell,* 2 Colo. App. 456, 31 Pac. 235.) This is a case in equity and the verdict of the jury is only advisory. (*Schneider v. Brown,* 85 Cal. 205, 24 Pac. 715; *Sweetser v. Dobbins,* 65 Cal. 529, 4 Pac. 540; *Diel v. Secunders,* 8 Cal. 281; *Stockman v. Riverside L. & I. Co.,* 64 Cal. 57, 28 Pac. 116; *Spottiswood v. Weir,* 66 Cal. 525, 6 Pac. 381; *Bell v. Marsh,* 80 Cal. 411, 22 Pac. 170.) Where special issues are submitted to the jury in an equity case, and the court itself finds on all the issues, error in giving or refusing instructions is immaterial, as the correctness of the findings are to be tested by the evidence. (*Hewlett v. Pilcher,* 85 Cal. 542, 24 Pac. 781.) Where, as in this case, the child was the guiding hand and the parent the dependent, there is a presumption against the deed made by the parent to the child. (*Highberger v. Stiffler,* 21 Md. 338, 83 Am. Dec. 593; *Silpler v. Lord,* 28 Ga. 52; *White v. Smith,* 51 Ala. 405.) There is nothing to prevent charging mental incompetency and undue influence in the same cause of action in a complaint. (*Argo v. Coffin,* 142 Ill. 368, 34 Am. St. Rep. 86, 32 N. E. 679; *Frish v. Newell,* 62 Ill. 198, 14 Am. Rep. 79.) If a person, however, has great weakness of mind, he may be able to contract, and the

contract upheld, unless undue influence is used upon him; and the condition of mind is important in determining the amount of influence necessary to overcome it. (Bispham's Principles of Equity, 230; *Oakey v. Ritchie,* 69 Iowa, 65, 28 N. W. 448; *Harding v. Handy,* 11 Wheat. 125; *Moore v. Moore,* 56 Cal. 92; *Allen v. Jewell,* 94 U. S. 506; *Eaton v. Eaton,* 37 N. J. L. 108, 18 Am. Rep. 716.)

QUARLES, J.—Plaintiffs brought this action in the district court of the third judicial district, in and for Ada county, to set aside a deed made to defendant, Katie A. Perrault, by her father, Milton Kelly, on the ninth day of February, 1892, conveying to said defendant certain lands, on the ground of mental incapacity on the part of said grantor, and fraud on the part of the defendant, Joseph Perrault, husband of said grantee. That portion of the complaint touching the incapacity of the grantor is in the following language, to wit: "That on the said ninth day of April, 1892, the said Milton Kelly was about seventy-two years of age. For about twelve months just prior to his death he had suffered from a stroke of paralysis, and was very feeble, and in consequence thereof his mind was greatly impaired, and he was wholly unfitted and entirely incompetent to transact any business of any kind, and that his condition was well known to the defendants at that time." Those portions of the complaint relating to fraud on the part of the defendants are paragraphs 5 and 7, as follows: 5. "That on the said ninth day of February, 1892, and for some time prior thereto, the said defendant Joseph Perrault was acting for and managing the business affairs of said Milton Kelly, and had full charge and supervision over all his property of every description." 7. "That on or about the ninth day of February, 1892, and while the said Milton Kelly was totally incompetent to transact any business, and did not know the effect of any act he might do, the said Joseph Perrault, without the consent of the said Milton Kelly, and while the said Milton Kelly was mentally incapable to consent thereto, caused and procured a deed to be prepared conveying to his wife, Katie A. Perrault, the entire tract of land described herein, and caused the said Milton Kelly to write his name to the said deed; and the said Perrault well knew at the

time that the said Kelly was entirely incompetent to know the effect of said deed, and knew that it was not his voluntary act, and that he did not realize that he was devesting himself of the title to said land." If the allegations in the complaint set forth above are true, the said deed was procured by fraud, and for that reason, as well as for want of capacity in the grantor, the said deed should be held to be void. The defendants, in their answer, denied specifically each of the allegations in the complaint touching the incapacity of said grantor, and also denied, specifically, each of the allegations tending to show the existence of fraud, and averred that the said grantor was competent to make said deed, and that "the execution of the same was the free and voluntary act of the said Milton Kelly, and it was wholly unsolicited upon the part of the defendants, or either of them." The cause was tried upon the issues as made, the court calling to its aid the assistance of a jury, who found a special verdict in favor of the plaintiffs, in accordance with which the court rendered judgment to the effect that said deed was made while the grantor was mentally incompetent to make it, and decreeing cancellation thereof. The theory upon which the plaintiffs, the court and the jury tried the cause seems to have been that the defendants, by the exercise of undue influence over the grantor while the grantor was in a weakened mental and physical condition, induced the said grantor to make the said deed, which he otherwise would not have made.

Three series of questions were submitted to the jury—one prepared by the court, one by plaintiffs and one by the defendants— each series covering to a great extent the ground covered by the other series. Such practice is to be condemned. The correct practice in such case is to submit only one series of questions, covering the material issues in dispute only. That the special verdict of the jury may be fully understood, we give the three series of questions, with the answers thereto, as shown by the record.

Questions submitted or prepared by the court, to wit: 1. "Was Milton Kelly, at the time of the execution and delivery of the deed in question herein, dated the ninth day of February, 1892, mentally capable of understanding the motive of his act and the

effect of the same? A. No." 2. "Was the said deed obtained from said Milton Kelly by the undue influence of the defendants, or either of them? A. Yes; to a certain extent." These were the only two questions prepared by the court.

The plaintiffs prepared questions, which were submitted, and which, with the answers, are as follows, to wit: "Q. On the ninth day of April, 1892, and at the time the deed in question was made, what was the age of Milton Kelly? A. About seventy-two years. Q. In what place and at whose residence did Milton Kelly die? A. Joseph Perrault. Q. What relation existed between Milton Kelly and the defendants? A. Father and father in law. Q. What connection, if any, did the defendants, or either of them, have with the business affairs of Milton Kelly on the ninth day of April, 1892? A. Of an advisory nature. Q. Was the deed in question made by Milton Kelly while under the influence, wholly or in part, of the defendants, or either of them? A. In part. Q. Was Milton Kelly, at any time after being stricken with paralysis, wholly or at all under the influence of the defendants, or either of them; and, if so, when and to what extent? A. He was, to more or less extent, during his illness and while in their company. Q. Was the deed in question made at the request of, or at the suggestion of, the defendants, or either of them? A. In our opinion, the making of the deed was largely suggested or instigated by Mr. Perrault. Q. At the time said deed was made, did confidential business relations exist between Milton Kelly and the defendant, Joseph Perrault? A. Yes. Q. Did the defendants, or either of them, after Milton Kelly was stricken with paralysis, attempt to acquire influence or control over him, or attempt to influence his actions and business affairs? A. We believe they did. Q. Did the defendants, or either of them, after Milton Kelly was so stricken with paralysis, take the management or control of the business affairs of said Kelly from the hands of his other children, and attend to such affairs himself. A. Yes. Q. What was the mental capacity of Milton Kelly after his attack of paralysis? A. Greatly impaired. Q. What was the mental capacity of said Milton Kelly after he received said stroke, and until the time of his death? A. Impaired. Q. Was Milton

Kelly, after receiving the stroke of paralysis aforesaid, and from that time until his death, capable and competent to manage and transact his most important business transactions? A. No. Q. Were the intellectual faculties of Milton Kelly, after the stroke of paralysis, weakened or lessened? A. Both. Q. Did Milton Kelly, at any time after said stroke, recover the full use of his mental faculties? A. No. Q. Was Milton Kelly, at the time the deed in question was executed, competent to transact his own important business affairs? A. No."

The defendants prepared questions, which were submitted, and which questions, with the answers of the jury thereto, are as follows, to wit: 1. "Was said Milton Kelly, at the time of the execution and delivery of the deed dated the ninth day of February, 1892, mentally capable of understanding the nature of his act and the effect of the same? A. We think not." 2. "Was said deed obtained from said Milton Kelly by the undue influence of the defendants, or either of them? A. To a certain extent." 3. "Were the defendants, or either of them, present when said deed was executed? A. No." 4. "Did the defendants, or either of them, or anyone acting on their behalf, solicit or request said Milton Kelly to sign the deed in question at the time he did sign the same; and, if so, who made the request or solicitation? A. Not at the time of signing." 5. "Did said Milton Kelly, at the time he executed the deed in question, understand what property said deed conveyed? A. To a certain extent." 6. "Did said Milton Kelly, at the time he executed and delivered the deed in question, understand to whom he was deeding the same property? A. Possibly he did." 7. "Did Milton Kelly, at the time he executed and delivered the deed in question, wish the property therein described to belong thenceforth to Katie A. Perrault? A. Possibly he did." 8. "Was said Milton Kelly made acquainted with the contents of the deed at the time he executed and acknowledged the same? A. As much as he could comprehend." 9. "Did he execute the deed in pursuance of his own wishes? A. He executed the deed through the influence of others." 10. "Did he deliver the deed in pursuance of his own wishes? A. Through the influence of others." 11. "If you find that said deed was obtained

by undue influence, state whether or not said undue influence amounted to force. A. Rather, persuasion." 12. "If you find that said deed was obtained by undue influence, state whether or not said undue influence amounted to moral coercion. A. Through moral persuasion." 13. "If you find that said Milton Kelly was mentally incapable of executing the deed, state how long he had been in that condition. A. From the date of his first stroke of paralysis." 14. "If you find the said deed was obtained by undue influence, state what facts constituted undue influence, in detail. A. We believe the deceased was prejudiced against the other heirs by the defendants, and his affections worked upon, to such an extent as to induce him to deed his property as he did. We believe this was made possible on account of the impaired condition of his health and mental capacity."

The verdict was agreed to by ten of the jury, who signed the same. The court adopted, with some changes, the findings of the jury as findings of fact, the principal change consisting in extending the answer to the second interrogatory propounded by the court to the jury so as to make the court's finding on this point read as follows: "That the said deed dated the ninth day of February, 1892, was obtained from Milton Kelly by the undue influence of the defendants."

There are no allegations of fact in the complaint, as we construe it, tending to constitute undue influence on the part of the defendants in the procurement of the deed in question. Where a party seeks to have a deed annulled on the ground of undue influence, he must plead the facts constituting the undue influence, the rule of pleading being the same as in cases of fraud. Undue influence cannot exist where the party acting has not sufficient mental capacity to know what he is doing. He must have sufficient mind to understand what he is doing, and be impelled by artifice or force or fear, from the conduct of others toward him, to do that which he does not wish or desire to do. As to the nature or character of the acts which will produce this state of mind on the part of a grantor, it depends upon the condition mentally of the grantor, and his surroundings, and influences to which he is subjected. That would be undue in-

fluence in one case which would not be in another. But where the grantor makes a deed, and is incompetent to make it—does not know what he is doing when he makes it—and he is induced to sign such deed, when he does not know the effect thereof, it would be absurd to say that he made such deed through coercion, force or fear, or that he did so for the sake of peace, and to prevent harassment by the grantee or others. We are of the opinion that the finding of undue influence by the lower court is not supported by the pleadings, nor by the existence in this case. If, as alleged, the deed in question was procured by fraud, the defendants should not be permitted to enjoy the benefits of such fraud. If, on the other hand, the grantor knew what he was doing when he made said deed, and it was in accordance with his wishes, the deed should be upheld. From the earliest days of civilization to the present time, the right of the possessor of property to dispose of it as he may desire (provided he does not commit a fraud in making such disposition) has been undisputed. We have given to this case more than usual consideration, owing to its importance, and for the reason that we neither desire to assist in the perpetration of a fraud, nor to overthrow the will of the grantor in the event that he knew what he was doing when he made the deed in question, and it was in accordance with his wishes.

The evidence shows that the grantor, Milton Kelly, was, when the deed in question was executed, about seventy-two years of age; that he had lived in Idaho since 1860; the most of which time he was a resident of Boise City; that he was a lawyer by profession, and had been on the bench of the supreme court of Idaho; that he was a man of more than average mental ability, possessing a strong will, and not easily persuaded or influenced; that during the later years of his life he was engaged in mining, publishing and editing a newspaper, and interested in various enterprises; that his business and interests were varied; that in March, 1891, he was stricken with paralysis, and was confined to his bed several weeks, but never fully recovered from the effects of such stroke; that after such stroke of paralysis he had great trouble in articulating, being at times unable to talk, and at other times able to talk distinctly; that he did business after

the paralytic stroke, bought goods, kept a bank account, gave notes and issued checks; that the plaintiff, James H. Bush, after this paralytic stroke, purchased some horses and cattle from him, and procured from him the assignment of some stock in the Rapid Transit Company; and that in February, 1892, the month that the deed in question was executed, he had a controversy with said plaintiff about the sale of interests in the Rossi Canal, in which they were both interested—the plaintiff Bush being opposed to the sale, and the grantor, Kelly, favoring it—and that said plaintiff Bush finally acquiesced. The important evidence in the case—that which tends to show the mental condition of the testator at the time the deed in question was executed—is briefly as follows:

Colonel C. H. Irwin testified: "I got acquainted with Judge Kelly first in 1890. I had business transactions with him, I believe, in February, 1892. It took place in the Capital State Bank. The business was in reference to closing up the negotiations for an option on the Rossi Canal and Payette property. Bush and Perrault were present. There were others, also, but I don't remember who they were. Judge Kelly had an interest in the transaction. I don't recollect of seeing him sign any papers, but he must have done so, because they were handed over to Mr. Eoff to keep in escrow. I went up to the Capital State Bank at the time of the transaction, and had the money in my hands to pay for an option. Kelly was there when Bush objected to closing up the transaction. Judge Kelly insisted that Bush was wrong about the matter, and that the thing should be closed up; and it was at Kelly's instance that Bush closed up the matter so far as he was concerned, and Kelly closed it himself so far as he was concerned. I was very much astonished at his so clearly understanding what there was to be done. I know it was in 1892. It was in February. It was after he had his paralytic stroke."

T. D. Cahalan testified: "I had known Kelly since 1865. I was well acquainted with him, and knew him after his paralytic stroke in 1891. I saw him frequently after that. The last time I saw him was in February, 1892—I think, a few days before he died. Saw him at the Hot Springs. Saw him prob-

ably once a week from the middle of June until along in Feb-
ruary.   I went to the Springs on an average once a week.   Every
time I went up there I would be with him from half an hour to
an hour.   We talked about different matters—about the Dubois-
Claggett case and other matters.   I never noticed any indica-
tions to the effect that he did not understand the matters con-
cerning which he was talking.   I talked with him about that
and other matters up to the last time I saw him, in February,
1892.   From my knowledge of Judge Kelly's condition, and by
reason of the conversations I had with him, I thought he was
competent to transact important business matters."   On cross-
examination he testified: "I would not have been afraid to have
tried a case before him the last year of his life.   I would have
been willing to take his judgment on it, and a case involving
large interests, but it would have taken him longer to do it than
it used to.   It might have been difficult for a person not ac-
quainted with him to have understood him.   There was some-
times a hesitancy in his utterance.   I understood him very well."

Alfred Eoff testified: 1 have been cashier of the Boise City
National Bank for nine years.   I knew Judge Kelly from April,
1886, until his death.   He had a bank account at our bank in
1891, and up to the thirty-first day of March, 1892, the date of
the last transaction.   Only a few days before he died, he con-
tinued to check against that account.   During the time of his
affliction, we always honored his checks when they came in with
his signature.   Sometimes he would come to the bank and is-
sue checks, and at other times they would come from outside
sources.   I could understand Judge Kelly's conversation.   I
transacted business with him and for him.   I was a witness to
a will at one time, made by Judge Kelly some time in January,
1892.   There were other witnesses—Mr. Kingsley and Edgar
Wilson, as I remember.   The Hot Springs property was willed
to Mrs. Perrault.   The will was delivered by Judge Kelly to me
for safekeeping.   Kelly transacted business at our bank after his
paralytic stroke, in the way of signing notes."

W. S. Bruce testified: "Have been assistant cashier at the Boise
City National Bank for seven years.   I knew Judge Kelly during
his lifetime—almost from the time I came to the city until his
death.   Knew him after his alleged paralytic stroke.   He had

an account at the Boise City National Bank at that time. The
bank honored his checks as they came in. He came to the bank,
and would sign his checks and would cash them there. He was
doing an ordinary banking business with us. I was present at
the time of the execution of the deed by Milton Kelly, about
the 8th of February, 1892. I don't remember the date exactly.
Those present were Charles Kingsley, Judge Kelly, and Edgar
Wilson. I don't remember who asked me to come up and wit-
ness the signing. Perrault was not present. Mrs. Perrault was
not present. I don't think that anyone suggested or asked
Judge Kelly to sign the deed. The deed was read over to him,
I believe—possibly not fully, but the vital parts of it were.
The description and the names were read to him, at least. I
was present all the time it occupied in taking this acknowledg-
ment and signing this deed. That signature is Judge Kelly's.
From what I saw and what took place, Judge Kelly knew what
he was doing when he signed that deed. I am satisfied of that.
He appeared to know what property was in that deed. He knew
to whom the property was conveyed, and, in my opinion, he
wished to convey it to Katie A. Perrault."

Mrs. Thomas Clark, who lived at the Hot Springs, and who
nursed Judge Kelly and looked after him after the paralytic
stroke, testified: "Judge Kelly informed himself of the current
news by talking with other gentlemen and asking us to read to
him. I would read quite a little out of the "Statesman" to him
every day, or have my sister to do so. Judge Kelly told me be-
fore I went to California that he intended to deed his property
to Katie A. Perrault. Some time after I came back, the last
of February or first of May, I said, 'Judge, I heard you made
a deed to this property.' He said, 'Yes,' and I said, 'Who did
you deed it to?' And he said, 'I deeded it to Katie.' He said
he had deeded his property to Mrs. Perrault. I had a business
transaction with him [Kelly] after I came back from California,
with reference to the amount I should pay as rent for the
springs. . . . . He wanted $100 per month, but finally came
down to seventy-five. It was about February, 1892, that I
leased the springs from him again.

Edgar Wilson, an attorney, and one of the subscribing wit-
nesses to the deed in question, and who, as notary public, took

the acknowledgment of Milton Kelly to said deed, testified: "Knew Judge Kelly some eight years. I was a notary public on February 9, 1892. I took Judge Kelly's acknowledgment to a deed running from him to his daughter. This is a deed to which I took the acknowledgment. Judge Kelly came into my office on that day—the day of the acknowledgment—and stated that he desired to execute a deed before me, and that some witnesses would be there shortly. Soon after Mr. Charles Kingsley and Mr. Bruce came up, and we all went into the back office, where my desk and notarial seal was; and the deed which Judge Kelly had in his hand, and which had been drafted before he came into the office, was read to him entire. My recollection is that I read it. And Mr. Kingsley, who was one of the subscribing witnesses, had a small map—a rough sketch of a map—of the land described in the deed, and he took this sketch and compared the description in the deed with the sketch; and Judge Kelly said it was all right, that he understood it, and he then signed. Mr. Bruce, Mr. Kingsley and Judge Kelly left the office with the deed. There was no one in the room at the time of the acknowledgment of the deed except Mr. Wood and those I have named. . . . . It was read to him and explained to him with more care than I usually took in my acknowledgments. . . . . I am convinced that Judge Kelly thoroughly understood the purport and meaning of the deed, . . . . for the reason that, in examining this plat or chart, Judge Kelly pointed out the different subdivisions of the land which he desired to convey. He stated that he desired to convey them to his daughter, and Mr. Kingsley, in my presence, at that time, compared these subdivisions, some of which were legal governmental subdivisions, and part of which were described by metes and bounds. As I recollect, Mr. Kingsley compared these with the description in the deed, and they tallied exactly. And, from Judge Kelly's actions generally at the time, I asked him if he understood the purport and meaning of what he was doing. He said that he did. From his manner and acts generally at the time, and on other occasions prior to that time, I was clearly convinced that he understood what he was doing, and that his mind was clear upon the subject, although his speech was inter-

fered with to some extent. About a month prior to this I witnessed his signature to a will. The property which was conveyed in the deed to Mrs. Perrault was willed to her in the will. . . . . I had done business for Judge Kelly before his affliction and afterward. . . . . He always seemed to be clear on what he desired in a business way, and he transacted his business affairs without any aid from others and without guardianship or otherwise. . . . . There was nothing said to him looking to solicitation upon the part of anyone to have his signature attached to the deed. No one even suggested that he sign the deed. He expressed a willingness to do so as he came in the office. I was not acting as agent or attorney for Mr. Perrault. I received no compensation for that acknowledgment."

C. S. Kingsley, one of the subscribing witnesses to the deed in question, and who is clerk of the district court, testified: "I was acquainted with Judge Kelly in his lifetime. His name is associated with my earliest recollections. . . . . I was present at the making of the will of Judge Kelly. It was in Wood & Wilson's office, and I think the only ones present were Edgar Wilson, Judge Kelly, Mr. Eoff, and myself. . . . . After my arrival the will was read. Mr. Eoff and Judge Kelly had a conversation in regard to the terms of the will, but what it was I do not remember exactly. . . . . I made myself as sure as I could that the terms of the will were understood by Judge Kelly, by asking him if he understood the will and if it was his will. He answered that it was and that he did. He signed the will, and Mr. Eoff and myself afterward signed as witnesses. In my opinion, Judge Kelly fully understood the contents of the will. I believe that he understood the nature and consequences of his act. I have no doubt about it. I was present afterward at the execution of the deed by Judge Kelly. These persons were Mr. Wilson, Mr. Bruce, Judge Kelly, and myself. Neither Mr. nor Mrs. Perrault was there. There was a map used there on that occasion in regard to the description of the lands. I identify this as the map. That map was made by me. . . . . I went to Wood & Wilson's office. I found there Mr. Kelly and Mr. Wilson. Mr. Bruce came shortly afterward.

After Mr. Bruce came in, the deed was read by Mr. Wilson, and a portion of it was re-read at the request of Judge Kelly. I had the plat in my hands, and followed the description contained in the deed upon the map. There was a description contained in the deed which could not be designated on the plat by legal subdivisions. After the reading of the description, at the request of Judge Kelly, and before he signed his name to the deed, I handed the map to Judge Kelly, and asked him if he understood this deed and the descriptions it contained, and what property was conveyed by it. He said that he did. I then said to him, 'There is an irregular description in this deed, and I wish you would point out to me on this map the tracts so described.' He took the plat and held it in his hand, and took a pencil and traced the boundaries of the irregular tract upon that plat. The ink lines are mine, and the pencil marks were made by Judge Kelly. This outlining was substantially correct, showing the location of that property. I could not tell from the description in the deed, myself, where the property was. It starts from a certain pile of stones, and runs to a cottonwood tree, so many steps from a clump of willows. I do not know where it was, and wanted to know whether he did or not, and at my request he marked it out on this plat. I went to Mr. Perrault's to witness the delivery of the deed. Judge Kelly and Mr. Bruce were with me. Mr. Perrault was not there. In my opinion, Judge Kelly fully understood the contents of that deed. He stated himself, at that time, that he fully understood that he was deeding the property contained in the deed to his daughter, Mrs. Katie A. Perrault. He understood the descriptions of the deed, and said the property was going to Mrs. Perrault."

R. Z. Johnson, an attorney, who was a witness for the plaintiffs, testified: "I dictated the deed. It was at Mr. Perrault's request. He had some time prior to that requested me to make it. I can't remember whether it was the same day or before. Some time shortly before. He undoubtedly gave me the description. I do not remember the act or fact of his giving it to me, but I had no other way of getting it. I had no personal knowledge of the matter. . . . . Mr. Kelly came in after I

had drawn the deeds. I think he asked for the deeds. He asked if Mr. Perrault was there, or had been there, and if I had prepared those deeds. I had no difficulty in understanding his conversation. There was some impediment in his speech, but I could understand him rather well. As far as I could notice, it seemed perfectly clear in his mind as to what he was there for. Seemed to know what he wanted and what he wanted to do; that is, that he wanted to go somewhere to execute those deeds. . . . . I thought it strange that they came to me to draw those deeds. I was not Mr. Perrault's attorney. Do not remember who took the deeds.—Kelly or Perrault. Talked with Judge Kelly. . . . . Intended to judge of his mental condition as best I could. . . . . I wanted to test his condition, from the conversation, to see if he knew what he was after. I formed an opinion as to his mental capacity—as to the material conditions. My opinion was that he understood what he was called on to execute; that he knew the nature. . . . . I felt that his mind was reasonably clear. . . . . I had heard of his condition, and I wanted to form an opinion in my mind whether he was entirely imbecile, or knew what he was about. I would not have given the deeds if I had believed he was."

Dr. Fairchild, who testified as an expert witness for the plaintiffs, in his cross-examination said: "It is admitted that our profession and the legal profession differ as to man's responsibility in the commission of crimes and everything else. Medical men claim that a man may take a gun and kill a man, and know that he is doing wrong, and not be responsible for that crime. . . . . I agree with Professor Maudsley in the rule he lays down as to legal responsibility. He lays down the proposition, I believe, in his work on Insanity and Mental Diseases, that the legal profession is two centuries behind the times, and that is my theory. I think he says something to the effect that the proper rule for legal responsibility has never been incorporated in medical jurisprudence. We physicians claim that is true now, as regards insanity and mental responsibility. There is a wide diversion between our idea of mental competency, as a member of my profession, and the rule of my profession,

and the rule of your profession, as laid down by the courts.
In giving my opinion in this case, I give it, to a certain ex-
tent, as a member of our profession, and with that measure in
my mind. If a man had sufficient mind to know what prop-
erty he owned, and sufficient mind to know to whom he wished
it to go, he would ordinarily be competent to execute a deed.
I would not consider Milton Kelly capable of executing a deed
on the ninth day of February, 1892, if he knew the property
which he owned, and knew to which one of his children he
wished it to go."

The undisputed testimony of these witnesses establishes be-
yond peradventure the following facts: The grantor, at the
time he made the deed in question, was competent to transact
ordinary business. He knew what he was doing. He knew
what property he was conveying, to whom it was being con-
veyed, the effect of the conveyance, and it was his desire and
wish to convey it to the grantee, his daughter, Mrs. Perrault.
From the existence of these facts the law concludes that the
grantor was, when he made the deed in question, competent to
make it; and we cannot hold otherwise without ignoring the
evidence, as well as all legal authorities touching on this ques-
tion. The first finding of the jury and the fifteenth find-
ing of fact by the court are not supported by, but are
contrary to, the evidence in the case. Indeed, there is no ma-
terial conflict of evidence on the point of the capacity of said
grantor to make the deed in question at the time it was made.
If he was competent at that time, the deed cannot be held void
for want of capacity. (See *Trimbo v. Trimbo,* 47 Minn. 389,
50 N. W. 350; *Buckey v. Buckey,* 38 W. Va. 168, 18 S. E.
384; *Freeman v. Easley,* 117 Ill. 317, 7 N. E. 656; *Trish v.
Newell,* 62 Ill. 196, 14 Am. Rep. 79; 1 Jarman on Wills, 51;
*McClintock v. Curd,* 32 Mo. 419; *Carpenter v. Calvert,* 83 Ill.
62; *Pickerell v. Morss,* 97 Ill. 220; *Stone v. Wilburn,* 83 Ill.
105; *English v. Porter,* 109 Ill. 285; *Rutherford v. Morris,* 77
Ill. 397; *Hix v. Wittemore,* 4 Met. (Mass.) 545; *Hall v.
Unger,* 4 Saw. 672, Fed. Cas. No. 5949; *Richardson v. Smart,*
65 Mo. App. 14; *Aiman v. Stout,* 42 Pa. St. 114; Bishop on
Contracts, sec. 962.) Mental incapacity which results from ac-
cident or violent disease is not presumed to continue. Such

incapacity on the part of a grantor must be shown by a pre-ponderance of evidence by the party attacking the deed of such grantor. (*Trish v. Newell, supra.*) The rule is well settled that the evidence of subscribing witnesses is entitled to great weight. (*Massey v. Huntington,* 118 Ill. 80, 7 N. E. 269; *Buckey v. Buckey,* 38 W. Va. 168, 18 S. E. 383.) In the case at bar, we have the testimony of an attorney who prepared the deed, the three attesting witnesses—one an attorney, one a clerk of the court and one a banker—as well as the testimony of another attorney and other business men, establishing the competency of the grantor at the time of the *factum.* The supreme court of West Virginia, in a similar case, in comment-ing on the evidence, said: "The list of witnesses upholding George Buckey's mental capacity include the clerks of the two courts, a former sheriff, two notaries (one an attorney) and an-other attorney, all close neighbors and intimate acquaintances, whose business brought them in contact with all sorts of men, and rendered their opinions of special weight." (See *Buckey v. Buckey, supra.*) The evidence which we have quoted at length was uncontradicted, unless it be by the mere opinion of the ex-pert witness, Dr. Fairchild, who judged the competency of the grantor by his, or what he calls the "medical," standard, which, according to his own testimony, is two centuries in ad-vance of the legal standard. But if we take his own statement as a standard, that "if a man had sufficient mind to know what property he owned, and sufficient mind to know to whom he wished it to go, he would ordinarily be competent to make a deed," there is no conflict in the testimony of all the witnesses on the question of competency of the grantor. The opinion of an expert is not entitled to much weight, as against the testi-mony of persons who are familiar with the party and the trans-action, and who testify as to the facts from which the compe-tency of a grantor is to be determined. (*Rutherford v. Morris, supra; Burley v. McGough,* 115 Ill. 11, 3 N. E. 738.)

Numerous witnesses testify to acts of the grantor occurring prior to the making of the deed in question which tend slightly to show that prior to the time of the execution of said deed the grantor was mentally incompetent. Evidence of such acts may

be proven as circumstances tending to show incompetency of
the grantor at the time of the *factum,* but such evidence is en-
titled to no weight unless connected with evidence tending
to prove incompetency at the time of the *factum.* The ex-
pert witness, Dr. Fairchild, was asked by counsel for the plain-
tiffs a hypothetical question, covering some fifteen folios of the
printed transcript in this case, which question was predicated
on a large number of supposed facts, many of which were en-
tirely unsupported by evidence, to which question the defend-
ants objected. The court should have sustained the objection,
and its refusal to do so was prejudicial error. Hypothetical
questions should be predicated upon facts proven, or which the
evidence in the particular case tends to prove; and not upon
conjecture.

The findings of the jury were inconsistent, and to some ex-
tent contradictory. Those relating to the question of unduc
influence show on their face that the jury were in doubt as to
the extent of undue influence on the part of the defendants.
The findings of the jury do not support the sixteenth finding
of fact by the court, that "said deed dated the ninth day of
February, 1892, was obtained from Milton Kelly by the undue
influence of the defendants," and said finding is not supported
by the evidence in the case. To justify a court in setting aside
a deed on the ground of undue influence, such influence must
exist at the time of the *factum,* and be a controlling influence
in impelling the execution of such deed. (*Guild v. Hull,* 127
Ill. 523, 20 N. E. 665; *Francis v. Wilkinson,* 147 Ill. 370, 35
N. E. 150; *Reichenbach v. Ruddach,* 127 Pa. St. 564, 18 Atl.
432; *Rutherford v. Morris, supra; Trimbo v. Trimbo, supra.*)
There is absolutely no evidence in the record before us which
shows that at the time the deed in question was executed the
grantor was under undue influence, but, on the other hand, the
evidence of the subscribing witnesses to the deed, and of the
witnesses to its delivery, as well as that of other witnesses,
shows conclusively that the execution and delivery of the said
deed was the free and voluntary act of the grantor, and made
by him in pursuance of his preconceived determination to give
the property conveyed by it to the grantee. Continued im-

portunity on the part of a grantee, made to the grantor, while such grantor is in a weakened mental and physical condition, to induce the grantor to make a deed, might impel the grantor to make such deed contrary to his wishes, for the sake of peace and quietude, in which case such importunity would constitute, in law, undue influence; but mere solicitation, which does not result in destroying the peace and quietude of the grantor, and impel him to act in order to be free from harassment, and thus induce him to make the deed when he otherwise would not have done so, does not constitute undue influence. There is some evidence in the record showing that the defendant Joseph Perrault, husband of the grantee, assisted and advised the grantor in relation to business matters, but such evidence does not support the charge of undue influence. In fact, we cannot accept the theory that the deed in controversy, which is shown to have been made by the grantor while he was competent to make it, and which the evidence shows was his free and voluntary act, should be held to be void for the reason that the husband of the grantee rendered the grantor assistance which was, in the language of the jury, "of an advisory nature." Such a conclusion would be frivolous and unwarranted in law. What we have heretofore said disposes of many of the errors assigned by the appellants.

The evidence tending to show that the defendant Joseph Perrault was indebted to the estate of Milton Kelly on a note, and that he acted unfairly in regard to the possession of such note, was not pertinent to the issues, and threw no light on the issues involved, and the objection of the defendants to the introduction of such evidence should have been sustained. Such evidence was liable to, and we think did, prejudice the minds of the jury, and its admission was error. It was also error to permit witnesses to testify to their opinion that the grantor was incompetent to transact important, or his important business matters. If the grantor was capable of understanding ordinary business transactions, and understood what he was doing when he made the deed in question, the law regards him as competent to make said deed, although perchance he might then have been incompetent to transact a more important or complicated business transaction.

It was also error to admit evidence of declarations of said grantor, made in 1889, touching his feelings toward his children, or his then intended disposition of his property. Where, as in the case at bar, the grantor, having sufficient mental capacity, freely and voluntary makes a deed conveying a portion of his estate to one of his children, such deed cannot be impeached by proof of prior declarations of such grantor inconsistent with such deed, and the admission of evidence tending to prove such declarations is error.

Numerous errors are assigned relative to the action of the lower court in giving and refusing to give instructions to the jury. In *Hewlett v. Pilcher,* 85 Cal. 542, 24 Pac. 781, the supreme court of California say: "Certain special issues were submitted to the jury, but the court finally adopted the findings of the jury, and found on all of the issues. This being so, the refusal to give instructions is not cause for a reversal of the case. If the findings are not sustained by the evidence, they may be tested by the evidence. If erroneous conclusions are drawn from them, the question may be presented in this court, and in either event the question whether the court erred in giving or refusing instructions becomes immaterial." A diversity of opinion once existed as to the correct manner of presenting issues of fact in cases in chancery to the jury, but the rule is now well established that the correct method is by interrogatories. As before suggested in this opinion, the interrogatories should cover the material questions in dispute. In this case the verdict of the jury was merely advisory, and the jury was called to assist the court in finding facts only. We doubt the propriety, in cases like the one at bar, of giving instructions to the jury. The case is unlike that of an action wherein the jury must apply the law and find the facts and where the court must instruct the jury as to the law applicable to the opposing views of the controversy which the jury is to fully determine. In the case at bar we are of the opinion that the instructions given were of no assistance to the jury, and would not aid in a correct solution of the issues which they were called to decide.

Inasmuch as the judgment of the lower court must be, for the reasons stated, reversed, we suggest that it will be proper

for the lower court to permit, if desired by plaintiffs, an amendment of the complaint, so as to tender the issue of undue influence, and the court would doubtless permit such amendment on application therefor. The order of the lower court denying the motion of the defendants for a new trial is reversed, and this cause is remanded to the district court, with directions to grant said motion for a new trial, and for further proceedings consistent with the views herein expressed. Costs of this appeal awarded to the appellants. Reversed and remanded.

Sullivan, C. J., and Huston, J., concur.