# Moore et al. v. Moore et al.

May 22, 1942.

Ross, Ross & Bayer and Joe P. Chenault for appellants.

D. Andrew Shearard for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

W. O. Moore died testate on April 18, 1940, while a

resident in the city of Berea in Madison county, and where he had resided since 1924. He left surviving him his widow, Sarah M. Moore, who died since the filing of this appeal, and the cause has been revived as against her in the name of her personal representative. There also survived him his two sons, the appellants, W. Todd Moore and Elmer C. Moore; also the three other appellees, John William Moore, Frances Elizabeth Moore, and Carlos Edward Moore, his three grandchildren and who are the children of his deceased son, Carlos M. Moore, who died in 1921.

Testator's will—after providing for the payment of all debts—bequeathed and devised to his wife, Sarah Moore, all of his property, both real and personal for and during her natural life, and at her death it directed that the same property be equally divided between his three grandchildren supra. He then incorporated this clause: "I am devising and bequeathing nothing to my two sons, W. T. Moore and E. C. Moore because I have heretofore given personal property to them and conveyed to them real estate which they have had the use of for a number of years and they have received as much of my estate as I think they should have." The will was later offered for probate in the Madison county court, which was resisted therein by the appellants here on the ground of testator's mental incapacity and undue influence exercised upon him in procuring its execution. Those defenses were overruled in the county court and the paper was probated as testator's last will and testament. From that order an appeal was prosecuted to the Madison circuit court and upon trial therein, after extensive proof taken, the jury returned a verdict sustaining the judgment of the county court which the court declined to set aside on appellants' motion for a new trial, and rendered judgment sustaining the validity of the will, to reverse which appellants prosecute this appeal.

Three alleged errors are urged upon us as sufficiently material grounds to authorize a reversal of the judgment, and which are (1) that the verdict is flagrantly against the evidence and is not sustained by it; (2) error of the court in failing to instruct the jury on undue influence and (3) error of the court in admitting incompetent evidence over appellants' objections. They will be considered and determined in the order named.

1. The determination of ground (1) necessarily in-

volves an appraisement of the proof furnished by both sides to the litigation, and which is not necessarily confined to the express statements of the witnesses, but whose testimony is to be viewed in the light of the circumstances and conditions surrounding the testator at the time of the happening of the isolated facts relied on to sustain the attack of mental incapacity. For sometime prior to 1924 the testator had acquired quite a large area of agricultural land in Madison county not far from the city of Berea. For some reason he concluded to abandon, or at least curtail, his farming interest, and he moved from his country home to that city, and rented separate portions of his landed estate to appellants, his two sons. The rental paid for the first few years was $1,000 per year, but later W. Todd Moore rented a distinct portion of the land at $600 per year; while Elmer C. Moore rented another distinct portion at a rental of $500 per year. The two sons sometimes furnished their father feed for stock that he kept at his Berea home and, perhaps, other produce of the farm, but when done they would charge him with the price thereof, and at the end of each rental year settlements would be made. The balance due the father would on some occasions be settled by note from the son who owed it, or if not wholely so settled it would partially be done in that manner. By the early spring of 1938 W. T. Moore owed his father $5,200, and the son Elmer C. Moore owed him $3,000. At that time they each executed their notes for such amounts minus $1,500 from the indebtedness of each, which was deducted because the two sons claimed that their father had advanced to his three grandchildren and their mother the amount of $1,500 by cancelling some indebtedness owed to him by them, and that the two sons were entitled to be credited by the same amount.

Appellants insist that such reductions were agreed upon and consented to by their father, but the proof of appellees is in conflict therewith, and is to the effect that the testator when informed of what had been done interposed strenuous objections thereto, followed by later violent family disturbances and quarrels, in which the appellants—or at least one of them—applied epithets and abusive language to both his parents, which occurred in the latter's residence and on its front porch and which was heard by surrounding neighbors. Such occurrences and, perhaps, others of less seriousness, produced a coolness between parents and children, which appear to have

continued throughout testator's life, and which was later followed by the execution of his will on November 1st of that same year, 1938.

Appellants stress the fact that testator had executed a prior will in which he devised to them substantial portions of his property, following his express desire that his descendants should share in his property equally. They, therefore, argue that the radical change made in his determination, as outlined in his last will now in contest, can be explained only upon the theory that at the time he executed it he was laboring under some insane delusion with reference to his two sons, and which rendered him mentally incapacitated to execute it. But that argument, while relevant to the issue is, of course, not conclusive; especially so after the happening of the subsequent events supra calculated to affect one's sentiment toward another, and which always follows maltreatment, and is seldom forgiven by the victim—as a result consequent upon the frailties of human nature. Therefore, what otherwise may have been a potent fact becomes of but little importance after explanation.

The case, as developed by the testimony, travels in the pathway blazed out by many similar ones that we are called upon to review, in that the life of the one executing the testamentary paper is laid bare, and every act or transaction in which he or she may have engaged is brought forward as bearing—howsoever remotely—upon the mental capacity of the involved individual. Hence, appellants' testimony attempts to prove a number of incidents and transactions of their father, which they insist conclusively prove his mental incapacity to make a will. Two of the most prominent facts upon which they rely to establish their contention are: that the testator some short time before making his will, after visiting one of his sons, said that he found on the premises a number of dead sheep, when the fact was that though the son referred to had sheep upon his farm, they were all alive when the father visited it, and that his statement that some were dead was an insane imagination on his part. Appellees, however, prove that the incident referred to had its foundation in a dream that testator had, and on awakening in the morning he related it to his wife, who, being motivated by a superstitious inclination, called the son over the telephone and inquired whether or not any of his sheep had died. In the conversation she informed

him what had happened, and that the latter either misunderstood the conversation of his mother, or had misrepresented it in order to serve his purposes in this contest case.

The other prominent fact relied on by appellants as showing mental incapacity of their father was that he stated to a witness that he had received a dividend on some stock he held in the Louisville & Nashville Railroad Company, and was much elated thereby, when in truth and in fact he owned no stock in that company. But the witness who gave that testimony stated on cross examination that he may have been mistaken as to the company issuing the stock referred to by the testator in that conversation, or whether it was Louisville & Nashville Railway Company stock or stock in some other corporation, and it was shown that testator did own stock in other incorporated companies. Testator at the time of executing his will was past 82 years of age. He had become more or less feeble physically and had suffered a slight stroke induced by what was thought to be a possible blood clot on the brain, causing him to fall at the time, and for that and an attack of dysentery—and possibly other ailments—he was in the hospital for a short while on three different occasions before his death.

At times thereafter—and especially after being aroused from refreshing naps—he would not immediately recognize his acquaintances who visited him, but which deficiency would soon disappear, following which he talked and acted normally and in a manner showing full and complete comprehension of his surroundings similar to that which he had always exhibited. A number of his immediately surrounding neighbors, living adjacent to him and who saw him more or less daily, gave it as their opinion that at the time he executed the will in contest he possessed the necessary mental capacity to do so. Many other detailed facts were brought into the case, some of which were denied, while others were explained, and all of which created the task of the jury in weighing the proof and concluding what were the actual facts.

After a number of years during which testator rented his landed estate to his two sons as hereinbefore referred to, and in 1933, he deeded to each of them separate parcels of his land—reserving a tract of something more than 100 acres for his own use, but which latter tract he later rented to one of them for a time at least.

The only consideration paid for the conveyances referred to was the assumption of incumbrances put upon the conveyed parcels by testator. There is a conflict in the testimony as to the excess value of the parcels of land so conveyed over and above the incumbrances upon them. The testimony of appellants attempts to show that the amount of the incumbrances so assumed were practically equal to the value of the conveyed land, or, at any rate, left only a small margin that could be considered as a gift from their father; but that testimony was also disputed by the proof offered by contestees, in which it appeared that the margin between the incumbrances assumed by the two sons and the value of the lands each received were substantial amounts. No doubt, the testator had in mind such conveyances when he stated in his will that he had already given to his sons (appellants) and they had received from him ''as much of my estate as I think they should have.''

The record also discloses that testator, and the mother of his three grandchildren, purchased a hotel in Berea which they attempted to operate for some years, but it turned out to be a disastrous venture financially, resulting in a loss to testator of between $12,000 to $15,000, to pay which he was compelled to create debts by borrowing money and to secure the loans to him, some of which were the incumbrances on the land conveyed to appellants, the payment of which they assumed. After such conveyances to appellants one of them re-conveyed to his father a portion if not all of the tract that had been conveyed to him, but in doing so testator's wife was made a joint vendee contrary to the agreement between vendor and vendee and which testator did not discover until later, and of which he stoutly complained.

A number of other facts involving transactions between father and sons were developed by the testimony, the tendency of which was to generate the belief on the part of testator that he was not receiving from them fair treatment, and which led him to believe that they had swindled him in some transactions, particularly in the sale of some stock in a corporation sold to him by one of the appellants and which later turned out to be worthless.

We have only touched upon some of what might be considered the most salient facts bearing on testator's mental capacity, since to undertake to consider each and all of them separately would swell the opinion far be-

yond due proportions, and for which reason we have concluded to state only the general nature of the testimony with our conclusions upon its probative effect, and which as hereinbefore stated, is the same as many other like cases brought before this court. The most that may be said is, that the entire proof in the case would perhaps sustain a verdict in favor of either side of the controversy. In such situation the question is eminently a proper one for the determination of a jury, and its verdict in solving all contradictions will withstand an attack on the ground that it is flagrantly against the evidence.

But it is further argued that plaintiff's age, and what counsel argue as the unfairness of the will, should largely weigh in the determination of the crucial issue of mental capacity of the testator, and they cite cases, some of which were rendered by this court, in which it was held that such facts are relevant in the determination of the issue of mental capacity; but no case holds that they are conclusive. Moreover, the rule is well settled that it does not require the same degree or extent of capacity to enable one to make his will as it does to make a contract inter partes. The latest case sustaining that proposition is Madden v. Cornett, 290 Ky. 268, 160 S. W. (2d) 607. See also Langford's Ex'r v. Miles, 189 Ky. 515, 225 S. W. 246. Appellants in their brief filed in this court place great stress on the testimony of two physicians who testified as experts, and who in answer to a hypothetical question propounded to them stated that according to their opinion testator was incapacitated mentally to make the will in contest, although his neighbors, as well as those immediately connected with the execution of the paper testified that according to their opinion—formed by associations with the testator—he did possess the requisite capacity. In relying upon such expert testimony counsel for appellants seem to attach to it the exact reverse weight which this and other courts have placed upon it.

In the case of Kentucky Traction & Terminal Company v. Humphrey, 168 Ky. 611, 182 S. W. 854, 856, in estimating the value of expert testimony, we said: "Expert testimony is regarded by the law as the weakest character of testimony" because, as pointed out in that opinion it is a species of hearsay testimony and made competent only "because of the necessities of the case." Also, that "the tendencies of the courts are constantly

inclining in the direction of narrowing the rule permitting its introduction, rather than extending it.'' The opinion continues by giving the reasons for characterizing it as ''the weakest character of testimony'' and cites authorities to sustain that statement. One of those reasons is that the expert witness ''always colors his testimony for the side introducing him, and, indeed, we learn from the history of the country that in great centers of population there exists experts following the business of bartering their expert or scientific knowledge to the litigant who can pay the highest price,'' &c.

Another reason for minimizing the weight to be given such testimony is that the hypothetical question which the expert witness is called upon to answer is itself colored and decorated with all the glamour that a legally permissible beauty shop can give it, and without disclosing any contradiction of the facts therein assumed. We, therefore, conclude that the contention that the expert testimony in this case was decisive and should have been followed by the jury can not be sustained, and we have also arrived at the same conclusions with reference to the merits of ground (1).

2. Complaint is made in ground (2) because the court gave no instruction to the jury on the alleged issue of undue influence, notwithstanding the paucity of the testimony to sustain that objection to the validity of the will in contest. No specific transaction, nor any act of any of the contestees is attempted to be proven from which the exercise of undue influence might be predicated. The most that is attempted to be shown is possible opportunities for the exercise of such influence; but the same character of opportunities also existed as between him and appellants, all of which were furnished by the meetings and associations of the respective parties with testator at more or less frequent intervals preceding his death. However, it is well settled that opportunities merely for the exercise of undue influence, without some proof of its actual exercise, will not be sufficient to submit that issue to the jury. The cases so declaring are so numerous and so completely in accord that we deem it unnecessary to list any of them.

But a more effectual reason why this objection to the verdict can not be sustained is that no instruction submitting that issue was offered by appellants. The omission to do so is attempted to be excused by the argu-

ment that where the court instructs the jury on its own motion it should do so on every issue presented by the pleadings and sustained by the proof. In other words, the argument is nothing less than an insistence that in civil cases it is the duty of the court to instruct upon the whole law of the case, and which proposition has been thoroughly settled otherwise by a long list of opinions to the contrary. Furthermore, it is argued in support of such omission to offer the instruction contended for that it was the duty of the court—where an insane delusion instruction was proper and was given (which was done in this case)—to give an instruction on undue influence; but the cases cited to sustain such contentions clearly point out that in each of them the omitted instruction was requested by the complaining litigant, and which clearly refutes the attempted avoidance of appellants in not offering the instruction complained of. Therefore, this ground is also without merit.

3. The only evidence complained of in brief, which it is claimed the court erroneously admitted over appellants' objections, relates to the signing of a number of notes of the appellants, as principals therein, by the testator as their surety, some of which were executed to a bank in Berea. In the first place, no objection was made to that testimony; but a more potent reason for disallowing this ground is that appellants themselves first introduced the testimony complained of, and the transactions were not referred to in proof by appellees until after they had been proven by appellants. Moreover, it is not entirely certain that such testimony is incompetent when viewed in the light of proven facts, since it refutes the contention of mental incapacity of the surety on the notes, because the signing of them represents transactions with the alleged deficient testator between him and the principals for whom he became surety, as well as transactions with the lender of the money represented by the notes and which would hardly be entered into if the surety was at the time mentally incapacitated to the extent of depriving him of the right to execute his will, when the character of transactions referred to requires a greater degree of mental capacity than the mere execution of a will, as we have hereinbefore pointed out. Also, such testimony in the circumstances of this case, may have inspired the belief in the testator's mind that he or his estate might be called upon to pay the notes upon which he was surety for his sons and to thereby justify

his conclusion stated in the will that appellants had received as much of his estate as he thought they should have. For the reasons stated this ground is also unsustainable.

Wherefore, the judgment is affirmed.