## Gailor et al. v. Chisholm et al.

### Nov. 27, 1942.

O. B. Bertram for appellants.

Fred Faulkner, G. J. Rice, George O. Bertram, Chas. F. Montgomery and Morris Montgomery for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

James Gailor died testate, while a citizen of and residing in Taylor county, in the latter part of September or the first part of October, 1940. In due time following his death a will executed by him on May 20, 1938, together with a later codicil executed on September 3 of the same year, were each offered and probated by the county court of Taylor county. The testator was a bachelor and, at the time of his death, was between 62 and 65 years of age, no precise date being shown in the record.

The appellants, as collateral heirs of testator, appealed from the judgment of probate to the Taylor circuit court, where the jury under directions of the court returned a verdict finding the testamentary papers to be the last will and testament of the testator, and from that judgment appellants and contestants below prosecute this appeal.

The statement filed by appellants in the Taylor circuit court, upon taking the appeal from the county court, relied on no specific grounds of contest, but only stated that the judgment of that court "should be set aside and held for nought," because both the alleged will and the codicil "were not the last will and testament of the decedent James Gailor," which general allegation entitled contestants to rely upon any ground justifying a court to set them aside. However, upon the trial appellants introduced no evidence to sustain any ground of contest other than mental incapacity of the testator and undue influence exercised on him by his only two devisees. The contestants as collateral heirs of testator are more or less numerous and consist of some brothers and sisters, with children of others who died before the testator executed his testamentary paper and codicil.

Many years before testator's death and after his mother had died, Ruben Gailor, his father, married the second time, but it does not appear that there were any children by that marriage, and the widow lived for 30 or more years with the testator in this case, who continued to reside on the farm of some 135 or more acres once owned by his father, and where the latter resided until his death in about 1902. In 1892, the father, Ruben Gailor, was threatened with some sort of legal proceedings against him for having wronged another woman, and in an effort to fence against a personal judgment against him (as argued by appellants) he deeded his comparatively small and cheap farm to testator, James Gailor, and his brother, John Gailor. In that deed he stipulated that the vendees were to assume a small incumbrance upon the land, and to provide Ruben Gailor's widow a home and support throughout her life if she survived the grantor. Later the testator herein purchased the half interest so conveyed to his brother, John Gailor, and thereby became the sole owner of his father's homestead. The father's deed was not in the nature of a gift, but was supported by both a monetary consider-

ation, as well as the other required obligations assumed by the vendees. There is no testimony in the case showing that the consideration was inadequate, even if such fact should have any bearing on the issues in this case, but which it does not. The testator, James Gailor, after his father's death became the head of a family consisting of himself and his stepmother. The latter's health was not robust and the testator (perhaps with the consent of his stepmother) procured a woman in the neighborhood by the name of Cox to take up her residence with them and assist in the housekeeping and in performing duties connected therewith, which arrangement was made a considerable period before testator's death. Mrs. Cox, at the time she entered the Gailor home under such arrangement, was the mother of a girl child who at the time of testator's death was between the age of 14 and 16 years, and consequently she was, at the time of the execution of the will, between 12 and 14 years of age. Some few years after Mrs. Cox entered the Gailor home she gave birth to a boy child whom she named Ruben Cox and it is indisputably shown by the testimony, as well as by testator's will, that he was the father of that child. Indeed, the fact of fatherhood of the unfortunate illegitimate is expressly admitted by testator in his will in its first clause stating: "I give, devise and bequeath to my illegitimate son, Ruben (Cox) Gailor, his heirs and assigns forever, all my property, real, personal and mixed of what nature and kind soever and wheresoever the same shall be at the time of my death." He then provided for the payment of his debts, funeral expenses and a grave marker and bequeathed to Mrs. Cox's daughter $10; and his illegitimate son should share the remainder of his estate, consisting of an 800 acre tract' of real estate, representing the amount of land conveyed to him and his brother by his father—referred to supra—with additional tracts purchased by the testator at later periods. Such was the situation at the time of testator's death. We will now proceed to discuss the testimony relating to the only two grounds of contest discussed in appellants' brief.

■ Ground (1) that of insufficient mental capacity, the proof shows that for quite awhile following testator's arrival at manhood he used to a moderate extent only intoxicating liquors so as to characterize him, as generally expressed, a "moderate dram drinker," but it

appears that some 5 or 6 years before his death his imbibing of intoxicants increased. During that period his consumption would be confined to ''spells'' as described by the witnesses, after which he would desist and become sober, followed by a return of his normal mental condition. During his later years, and following his increased indulgence as described, he became afflicted with disorders, both of his kidneys and bowels, and when in the most extreme intoxicated condition during such drinking spells he would sometimes allow both functional organs to discharge in his clothing and would sometimes dry the effects of his kidney action while clothed by standing before the fire. Even during such extreme situations it is quite conclusively shown that he continued mentally able to transact business and did do so throughout the period of the beginning of his alleged increased indulgence. Following his father's death he began to lend money in small sums to applicants therefor, which he followed until his death. Besides lending money, he also engaged in what is commonly known as ''shaving notes'' by buying notes from parties to whom they had been executed. In both his lending and his shaving transactions he exacted, demanded, and obtained a high rate of interest on his loans, and perhaps a larger deduction from notes that he would purchase against others, and it was almost entirely from such engagements that he began rapidly to increase the amount of his holdings, which at the time of his death amounted to some $30,000 in notes, $20,000 of which was indisputedly solvent, as testified to by the appraisers of his estate, which they stated might be augmented by a considerable number of other notes, appraised by them as insolvent because the makers thereof were unknown to the appraisers and they possessed no information about them and listed such obligations as being insolvent, although some of the notes so listed were shown at the time to be well secured by mortgages on real estate.

In buying surrounding tracts of land, testator would on some occasions not have the amount of cash on hand to pay the consideration, therefore, he would borrow money from the bank with which he did business, to meet such obligations. The appellants and contestants introduced some witnesses to prove some scattering and feather weight transactions and acts, which they claimed were sufficient to conclusively establish mental incapacity

—an illustration of which (and perhaps the most potent) was that on one occasion, when an applicant wished to borrow from testator a small amount, he had some trouble in counting the amount requested, and another person who was present assisted him in doing so; but at that time he was passing through one of his periods of excessive drinking. However, the testimony as a whole indisputably shows that during sober periods, which at the least was half the time (the overwhelming weight of testimony showing that it was of a greater proportion), he was in full possession of his faculties, and even when he was in an extreme state of intoxication he would have a general idea of the transaction in hand and which the person with whom they were had must or should have thought so, else they would not have engaged in it when the other contracting party was mentally disabled from doing so. There were, as stated, other minor items of testimony of no more probative potency than the one we have related.

The physician who regularly attended testator wrote the will at the former's request, and it was read to him by the physician preparing it in the presence of the subscribing witnesses whom testator had selected as such. The physician was dead at the time of the trial, and, of course, did not testify as to the mental condition of his patient, either prior to or at the time of the execution of the testamentary papers in contest, but the other witnesses thereto—in addition to the physician who himself was a witness—testified that testator was perfectly sober on each occasion and talked as rationally as he ever did with, perhaps, some explanation as to why he so drafted them. The codicil made no change, except to increase the amount of only $10, devised to the daughter of Mrs. Cox in the original will, to the sum of $500, and stating that she had been kind to him in many respects. It thus appears from the excerpt from his will that he desired that his own child—although illegitimate—should have his remaining property.

Two physicians, neither of whom had administered to the testator, on a hypothetical question based upon the unconvincing items of testimony to which we have referred—plus extreme intoxicated condition on occasions—stated that in such circumstances they doubted whether testator's mind was in the condition required for the execution of his will; but on cross examination

they both showed clearly that if he was sober at the time, they did not regard his condition at other periods as disqualifying him from performing such a function.

In a great number of cases, and without dissent, we have uniformly held that the character of testimony related was insufficient to sustain a verdict finding mental incapacity of testator, even though it included that given by physicians answering hypothetical questions of the character and nature of the examination of such witnesses in this case. It would be a work of supererogation to undertake to list all of those cases, but they are referred to and fully sustain our statement as to the correct rule in the very late ones of Madden v. Cornett, 290 Ky. 268, 160 S. W. (2d) 607; Moore v. Moore, 290 Ky. 715, 162 S. W. (2d) 547, and Poole v. Stansbury, 281 Ky. 567, 164 S. W. (2d) 816. Other cases of similar import are listed in those opinions and in some of them the testimony supported the theory of mental incapacity of testator to a greater degree than it did in this case. In the Moore case we referred to and commented on our estimation of the probative force of expert witnesses' answers to hypothetical questions, as appeared in the case of Kentucky Traction & Terminal Company v. Humphrey, 168 Ky. 611, 182 S. W. 854, and in that case we added to such reasons the fact that the professional testimony in such instances was based upon the state of facts incorporated in the hypothetical questions which "is itself colored and decorated with all the glamour that a legally permissible beauty shop can give it, and without disclosing any contradiction [or contradictory testimony] of the facts therein assumed." [290 Ky. 715, 162 S. W. (2d) 550]. In the same (Moore) opinion we stated—following a long list of prior opinions—that: "The rule is well settled that it does not require the same degree or extent of capacity to enable one to make his will as it does to make a contract inter partes." In the same case the testimony relied on to sustain mental incapacity—including transactions, acts and conduct by the testator—supported that theory much more than does the testimony in this case. Some of our opinions, which are cited in the two cases heretofore listed, dwelt upon the fact that in contest will proceedings the contestants were ever ready to search the life of testator with a fine-tooth comb by proving a multiplicity of his acts that were somewhat out of the ordinary, but which

frequently occur, and especially with older people, but which we held were far afield from establishing the necessary mental incapacity to set aside the will. Most generally that is true notwithstanding the contestants may have never raised the question of mental incapacity before testator's death, at which time it suddenly occurs to them that some time or another throughout testator's life he did this, that, or the other, which was not altogether in the usual course with the majority of people, but which, we in every such instance held were insufficient to support a finding of mental incapacity.

Such was the condition of the law before the rendition of our opinion in the case of Nugent v. Nugent's Ex'r, 281 Ky. 263, 136 S. W. (2d) 877, revoking the theretofore prevailing rule in this jurisdiction known as the "scintilla rule." If before that opinion was rendered the testimony relied on in this case on the issue of mental capacity was insufficient to establish mental incapacity, a fortiori would it be insufficient under the rule as announced in the Nugent case revoking the "scintilla rule," and would require the giving of a peremptory instruction directing the verdict to be returned.

■ The only proof of undue influence was the statement made by some nephews, and perhaps nieces or relatives of theirs, who testified that on one or possibly two occasions the illegitimate child of testator (the chief devisee in his will) made some statements that he procured or persuaded his putative father to make the will, when at that time the boy was only 10 or 11 years of age. But if the testimony had been true, he then knew nothing about wills. However, if such statements were made by him, it was done, no doubt, in a spirit of braggadocio. Besides, there is no pretense made in any of the testimony of the specific character of persuasion or efforts made by the youthful illegitimate in bringing about the execution of the will. On the contrary, the testimony shows that testator was very much attached to his illegitimate offspring and often stated to others that he intended to leave his property chiefly to that son. It would serve no useful purpose, or alter the status of the case, for us to encumber this opinion with a list of cases holding that such influence must be of a character to induce the testator to execute his will, when without it he would not have done so, and of a character as to overcome his intention and purpose and to substitute therefor that of

the undue influencer. This ground appears from the brief to not be seriously relied on. If, however, it were otherwise, it is equally clear that the testimony fails to show any undue influence by any one that measures up to the requirements of the law prescribing the necessary quantum of proof to accomplish the purpose for which it was introduced.

Some other questions are casually mentioned as alleged errors, such as the wrongful admission of testimony, but only once was an avowal made throughout the trial and that was touching a question which we are clearly and indisputably convinced was utterly immaterial.

Our final conclusion therefore is that the court was justified from the proof adduced in giving the peremptory instruction complained of, and the judgment is affirmed.