In the Matter of the Estate of Maude Elizabeth Johnston, Deceased.
CLYDE M. WATTS,

*Petitioner and Respondent,*

vs.

ADA J. FARMER and MARJORIE J. JENSEN,
*Contestants and Appellants.*

(No. 2361; June 10th, 1947; 181 Pac. (2d) 611.)

For the Contestants and Appellants, the cause was submitted upon the brief and also oral argument of L. C. Sampson, of Cheyenne, Wyoming.

For the Petitioner and Respondent, the cause was submitted upon the brief and also oral argument of Carleton A. Lathrop and Clyde M. Watts, appearing pro se, both of Cheyenne, Wyoming.

334

336

## OPINION

BLUME, Justice.

Maud Elizabeth Johnston, on July 9, 1945, duly executed her last will and testament, devising and bequeathing her property, valued at about $26,000.00, to friends, most of them former pupils in music, one of them a woman who had for a long time taken care of the home of testatrix. The latter left no property to her relatives. She died on April 13, 1946. The will was offered for probate by Clyde M. Watts, who was appointed executor in the will. Opposition to the probate of the will was filed on May 14, 1946, by Ada J. Farmer and Marjorie J. Jensen, sisters of the deceased. It was alleged that they were the sole heirs at law of the deceased, and they opposed the probate of the will on the ground that on the date of the execution thereof the testatrix was of unsound mind and mentally incompetent to make and execute her will, and prayed that the contestants be declared entitled to administer the esate. They also alleged that the will was executed under duress, but that allegation was subsequently waived. The deceased was seventy years of age at the time of her death.

It would subserve no good purpose to set out the details of the testimony herein, which was rather voluminous. We think it is sufficient to set out what seem to be the highlights of her life as portrayed by the various witnesses, and these highlights are, in the testimony, divided sharply, those of her life up to about 1919 to 1920, given in the main by her relatives, and those of her life after 1920 up to the time of her death, as given by persons outside of her family. In her earlier years testatrix taught school for a few years in Cheyenne, thereafter gave lessons in music on the piano at the home of her parents up to about 1919, and thereafter in her own home. Marjorie J. Jensen was seventeen years younger than the decedent, and the following appears from her testimony: Testatrix practically took charge of the witness in the latter's early life, and acted more like a mother toward her, giving her music lessons and generally taking charge of her education, claiming that mothers, on account of their love for their children, were not able to raise them satisfactorily. So the witness was compliant with her sister's wishes. No rift in their affection arose until about 1910 when Marjorie was about seventeen years of age. At that time witness refused to follow her sister's advice, and decided never to ask her again what to do. That was the beginning of the trouble between them, and that condition continued to prevail. After that time the testatrix spoke little to her sister and in the main ignored her, although several years thereafter the testatrix was friendly with the witness' little boy, and at times took him to her room. The witness went to a conservatory of music about 1912 for the period of about two years. When she came back in the summer of 1913 she found that the decedent did not eat with her family —her father and her mother. During the summer of 1913 and 1914 and thereafter, testatrix cried a lot when she played on the piano, to the extent of annoying

the neighbors who made complaints in reference thereto. The testatrix during these years taught music on the piano; her classes started at 8:00 A. M. and ended about 6:00 in the evening, but she also had some pupils during the evening. At times she had as many as fifty pupils. The part of the home used by her for teaching and for recitals was not permitted to be used by the rest of the family. The mother was relegated to her bedroom or the kitchen, which she did graciously. The mother also cooked meals for the testatrix as well as for her company. In the summer of 1915 the decedent attempted to commit suicide. All the other members of the family were out to a wedding. The decedent refused to go and locked herself in her room. When her mother came home she heard her groaning. The father broke open the door and found testatrix stretched on the floor in the dressing room. There was present a glass half filled with strychnine pills. There was also an empty bottle of chloroform which decedent had bought in Denver. Dr. Johnston, an uncle, was called, who administered an antidote. During these years the testatrix spoke very little, either to her mother or to her father except only when she had something of which she wanted to complain. But when the mother became sick in 1918 decedent spoke "and there was a little of the hardness gone." At Christmas time in 1915 the testatrix went after the servant in the house with a stove poker, the mother interfered and then testatrix went after her. The witness put a stop to that incident.

The mother died on November 11, 1919. The question then arose of what to do in keeping up the family home as well as taking care of the surviving father. It was suggested by Mrs. Jensen that the testatrix was the proper person to do that, and the latter stated that she would do the best that she could, and would get a housekeeper. Mrs. Jensen, however, stated that "the best up to this time has not been very good." There

was an altercation as to cooking breakfast for the father and eating with him at the usual times, which, however, in the opinion of the testatrix, was not possible as it would interfere with the time of giving her music lessons. That did not satisfy the contestants. The testatrix it seems was at that time affected by a spot on her lungs and it was suggested to her by both contestants that she go away for a year, and then come back, and that Mrs. Jensen in the meantime would run the house and take care of their father, but that Mrs. Jensen could not afford to do so if the testatrix remained in the house for fear that her child would be exposed to tuberculosis. The testatrix, however, did not want to go away, stating that she could not afford it. It was finally agreed, without going into further details, that the decedent should move out, leaving Mrs. Jensen to take care of the house and of her father. According to the testimony of the contestants this was agreeable to the decedent, but according to the witness Miss Fincher, she in fact felt that she had been removed from the family home. From that time on all social relations between the sisters ceased and were never resumed up to the time that the testatrix died. The father died in 1930, treating his children equally, and leaving approximately $30,000 to each of the children. Mrs. Jensen, contestant herein, made some sort of claim against the executor of the estate of her father, the nature of which does not appear herein. The claim was contested by the testatrix. The record fails to disclose the outcome.

The witness Miss Fincher testified that the testatrix was rather reserved with her family, and that she had told her she did not eat with the family because she had pupils who had to come during the family meal time, and so she, the testatrix, had her meals alone; that she had her breakfast late because she worked hard and felt that it was her only indulgence. The

witness stated that when she was at the home of the parents of the testatrix on holidays the latter had her meals with her parents and the guests.

Dr. Johnston, uncle of the decedent, testifying as an expert neuropsychiatrist, stated in substance as follows: He had at numerous times observed the condition of the testatrix in the family home. In 1918 he was called by his brother, the father of the testatrix; he found the latter in an acute state of mania; she was fighting desperately with her father in attempting to walk into the street screaming and abusing her father; she told the witness that his own brother had struck her; her father endeavored to keep her from going out on the street; the doctor spoke to her and asked her to talk things over; the mother walked along with the witness and asked him to do what he could; then the testatrix spoke to her mother and said "go back, you old hag, I hope I shall never have to look upon your ugly face again"; the testatrix cursed the witness "beyond anything I could believe a woman could ever devise." She told falsehood after falsehood about her parents. In 1915, evidently referring to the occasion already testified to by the witness Mrs. Jensen, he was called to the family home and found the testatrix in a comatose state, groaning and making a great disturbance; in her room was a glass containing strychnine tablets. The testatrix at that time was a strychnine addict. When the witness examined her he found that her symptoms did not coincide with strychnine poisoning; that the testatrix actually had not taken any strychnine and the case "turned out to be an absolute sham." According to the doctor's testimony, she suffered from paranoia, and that her condition was incurable. It does not appear that the witness had anything to do with the testatrix after the latter established her own home.

Robert J. Stewart, a physician trained in neurology and psychiatry, corroborated the testimony of Dr. Johnston after hearing the testimony in court, although he had never seen or talked to the testatrix.

The proponents of the will introduced about twenty witnesses from various walks of life; a lawyer, a physician and surgeon, an architect, a banker, a teacher, a businessman, and others, and an altogether different picture is portrayed by some of them, particularly for the last twenty-six years of the life of testatrix; a picture as bright as that of the preceding decade portrayed by contestants was dark; a picture of an almost idyllic life for twenty-six years as compared with the portrayed somber life of the preceding time. The contrast could be no greater. Some of the witnesses had known the testatrix for 36 and 40 years; most all of the others for a great number of years prior to the execution of the will in question. All of the witnesses agreed that she was of sound and disposing mind and memory during all of that time. The testimony shows that she was careful in business matters, prompt in the payment of her bills, kind to her friends, jovial and happy in her social relations. She continued to give music lessons until 1939; gave many and continuous concerts in her home and in the parish house; frequently attended concerts in surrounding towns and cities. She belonged to a Shakespearean Club, read poetry and music, as well as other books. In 1939 she went to England for the second time, visited the burial grounds of the classic poets, and wrote enthusiastic and interesting letters of what she found. We should, perhaps, set out some excerpts from the testimony of some of the witnesses.

The witness Ellen De Armon had known the testatrix for thirty-six years; kept in contact with her; visited back and forth; took trips with her to the

mountains. The testatrix was always doing something nice, like sending flowers, inviting the witness to dinner and down to her house; she carried on a normal conversation, and she and the witness had a lot of fun. "I would say," stated the witness, "that she was perfectly sane during that time," namely during the thirty-six years above mentioned. The witness Edith Duthie had known the testatrix for forty years, intimately for twenty-five years; saw her frequently; belonged to the same literary club as the testatrix; they were in each other's homes. The witness attended many music recitals of the testatrix. The latter was "very sound and very brilliant; I saw nothing to indicate otherwise." The witness Ada Geist knew the deceased since 1921; took music lessons from her for three years; went to Laramie with her and with other friends several times; went on picnics with her; had Thanksgiving dinner with her. Her conversation was very normal. Testatrix "was very interested in current events and had an interesting opinion about how things were going. I would say that she was absolutely sound and sane. I never saw her or heard of her having any delusions." The witness May Mahoney had known the deceased well for about thirteen years. They did literary work together; witness often went to decedent's home; dropped in for a visit and for material for papers for literary meetings; saw the deceased about once a month for the last two or three years. Testatrix was a fluent conversationalist. The witness saw her in New York just before the latter sailed for Europe, and had interesting visits with her. She received cards and letters from her at Easter time, on Valentine's Day, on St. Patrick's Day. After testatrix quit giving music lessons she read, practiced on the piano, listened to radio programs, to symphonies, operas, and news of commentators; frequently gave the witness books as a loan or gift, including books on poetry; gave wit-

ness magazines as reference material and frequently marked and made interesting comments on articles in Time, Readers Digest, the Atlantic Monthly, often making pertinent remarks on the articles. Witness discussed literature with the testatrix; the latter enjoyed humorous reading; she was of very sound mind; she was not only able to handle her property competently but very efficiently. The witness Ruth Kingham took music lessons from the deceased for about six to eight years; saw the latter frequently since that time; was invited by her to music recitals given by the deceased in the latter's home, the parish house and the Carnegie Library. Testatrix kept her house nicely and was very painstaking; read a great deal; had many books in her home; was very fond of radio programs and would listen to broadcasts. The witness took trips with the testatrix and others to Boulder, Ft. Collins and Denver, attending concerts. They attended movies together, especially musicals, since decedent liked Bing Crosby, Jeanette McDonald and Grace Moore. Witness received cards from the testatrix, including some from England when the latter was there in 1939. She had many conversations with her; saw her frequently in 1945 and on the very day, namely on March 24, 1946, when the testatrix had a hemorrhage, which began her last illness. The testatrix was very well read; was an intelligent woman, very interesting and entertaining; she had a sense of humor and dry wit; was a woman of great refinement and good breeding. She was most definitely of sound mind and sane; definitely able to handle her own affairs during all the years the witness knew her. Dr. Joder, a physician and surgeon, treated the deceased commencing with January 16, 1946, to the time of her death, which occurred on April 13, 1946. He saw and talked with the deceased a number of times up to the time of her last sickness which began on March 24, 1946, with a pulmonary hemorrhage. The testatrix

did nothing and said nothing that made the doctor feel that she was otherwise than mentally normal, and she seemed to be competent to handle her affairs and was prompt in paying her bills.

Counsel for contestants lays stress on the fact that the testatrix made an unnatural disposition of her property. It is stated in 68 C. J. 609 that a person may bestow or refuse to bestow his property upon whomever he pleases; that a will is not rendered invalid by the mere fact that the disposition of property is unnatural, unreasonable or unjust, or is not in conformity with the statute of descent and distribution, but that an unnatural or unjust distribution may be shown as a circumstance bearing on testamentary capacity. What is and what is not a natural disposition of property by a decedent is not always easily answered, particularly in a case which involves, as here, merely collateral relatives. Under the Roman Law, the disposition of the property in this case would not have been considered unnatural. No one was permitted to attack as unjust a testament of his or her brother or sister, unless the instituted heir was base or dishonorable. Code Justinian 3, 28, 27, Buckland, Textbook on Roman Law (2d Ed.) 328. That rule is, perhaps, not wholly without value even today. Friendship frequently far outweighs, in the human mind, the mere fact of blood relationship. If the testatrix had married, leaving surviving her children or husband, contestants could hardly have expected any of her property upon her death. Marriage takes place in the usual course of life. Hence a bequest or devise from a collateral relative is generally unusual and but the merest windfall. And to say when no such unusual bequest or devise is made when testator never married, that this nevertheless necessarily shows an unnatural disposition of property would be going too far. A somewhat different situation might be presented, if in addition to blood relationship, there existed

also friendship or intimate social relations, which is not true in the case at bar. It is stated in Page on Wills (Lifetime Edition) Sec. 842, that "a will which excludes collateral relatives in favor of a personal friend, or persons who have shown great kindnes to testator, is not immaterial as a matter of law." See also In Re Visaxis' Estate, 95 Calif. App. 617, 273 Pac. 165; In Re McDermott's Will, 90 Misc. Rep. 526, 154 N. Y. S. 923, 925; 68 C. J. 477. In Re Miller's Estate, 10 Wash. 2d 258, 116 Pac. 2d 526, 531, the court said:

"Whether a will is natural or unnatural is a question to be determined in each case as warranted by the facts. Mental incapacity on the part of a testator is not presumed on the theory that it was unnatural and unreasonable to execute a will giving all property to a stranger and cutting off one's kin. In the determination of the question what is unjust or unnatural the history of the testator's family is to be considered and the moral equities and obligations appearing therefrom. A will is unnatural when it is contrary to what the testator, from his known views, feelings and intentions would have been expected to make. If the will is in accordance with such views it is not unnatural however much it may differ from ordinary actions of men in similar circumstances."

It cannot, accordingly, be said as a matter of law, that the disposition by testatrix of her property in favor of her friends is not just as natural a disposition thereof, or more so, than a disposition thereof in favor of her collateral relatives. Hence contestants must, in the main, recover, if at all, upon the strict ground that the testatrix was otherwise shown to be of unsound mind when she executed her will.

Counsel for contestants states in his brief: "The testimony clearly shows that the deceased early in life developed a paranoid psychosis, paranoid insanity, a mental disease chronic in its nature, first resulting in a delusionment toward her parents, always figuring

that they were doing everything wrong, from the improper raising of the younger sister, to mistreatment of herself." It is quite apparent that counsel seems to assume that the trial court was bound to credit all the testimony given on behalf of the contestants, but that, of course, is not true. Such cases as Branson vs. Roelofsz, et al., 52 Wyo. 101, 70 Pac. 2d 589; Stone et al. vs. Grainger (Tex. Civ. App.), 66 S. W. 2d 484; Doyle vs. Rody, 180 Md. 471, 25 Atl. 2d 457, do not aid contestants. In those cases the appellate court affirmed the judgment of the trial court on conflicting evidence. In this case counsel for appellants asks us to reverse the trial court upon like conflicting evidence. Contestants and Miss Fincher did not testify that the testatrix was insane. In fact the former negotiated with the testatrix in connection with the maintenance of the family home after the mother died in November, 1919. There is no indication that during that somewhat extensive negotiation contestants did not consider testatrix to be mentally sound. The crying spells of the testatrix testified to, if true, seem, of course, unnatural. The attempt of testatrix to kill herself was apparently considered by Dr. Johnston as more or less of a sham. These incidents cannot, we think, be considered as a matter of law to be proof of insanity. There is no positive proof in the record from which we can say that the trial court was bound to believe that these incidents were the result of a delusion of mistreatment of testatrix by her parents or by anyone else. We do not know the basis thereof. The record discloses that the testatrix worked hard, in fact, unusually hard, according to the testimony of Mrs. Jensen; that she occasionally, perhaps even many times, became tired and weary is not improbable, and possibly partially explains these incidents as well as her attitude toward her parents and her sisters. Mrs. Jensen testified that the testatrix kept company with a man for twenty-five years, but marriage for one reason

or another was frustrated. Whether or not the so-called attempted suicide on the very eve of a wedding in the family circle was merely a coincidence or had any connection with this frustration is, of course, the purest conjecture, but so far as we can tell from the record, might be just as true a basis for her acts as anything else. If any delusion existed which had an effect upon the disherison of the sisters, it is based on the claim of the testatrix that she was driven from her family home. That cannot as a matter of law be called a delusion, let alone an insane delusion. It has at least some basis in the facts, even though slight. It appears that testatrix wanted to stay in the family home. It appears, too, that her sisters did not want her to stay under the conditions mentioned by the testatrix. It is quite clear that while the agreement finally reached by all three sisters was apparently satisfactory to the testatrix it was in fact not so. So, too, the claim that Marjorie Jensen had received better consideration on the part of her father than testatrix seems to have some basis in the facts, for it appears that Mrs. Jensen went to a conservatory of music at the expense of her father, while so far as shown by the record, that was not true in the case of testatrix. It is well established that when a certain belief of a testator is founded upon evidence, though slight and inconclusive, it is not an insane delusion. 1 Page on Wills, supra, sec. 146; In Re Balks' Estate, 298 Mich. 303, 298 N. W. 779. It is, of course, quite apparent that the testatrix had a prejudice against her sisters and disliked them. In fact, she told her neighbor, a tenant, not to permit her relatives to enter her house. But prejudice and bias is not the same as an insane delusion. 1 Page, supra, Sec. 144. And the courts seem to be agreed that "the fact that testator dislikes certain of the natural objects of his bounty does not establish an insane delusion; even if such dislike is groundless; and still less if such dislike is based

upon some reason, although it may be an unjust one."
1 Page, supra, Sec. 146. The evidence, we think, indi-
cates that there was some basis, though slight, of the
dislike of testatrix for her sisters, especially in the case
of her sister Marjorie. In brief, we cannot say as a
matter of law, in the face of the testimony for the pro-
ponents of the will, that the trial court was bound to
find that the testatrix was insane by reason of the
testimony of the lay witnesses above considered.

That leaves for consideration the testimony of the
physician who testified for the contestants as experts
on mental diseases. One of these was Dr. Johnston, a
well known, eminent and highly respected physician, in
whose integrity we have the utmost confidence. How-
ever, the requirements of mental soundness in the legal
sense, so as to constitute testamentary capacity, are not
as rigid as those in a medical sense. A mind legally
sound may be medically unsound. 32 C. J. S. 403, 1
Page on Wills, supra, Sec. 128. And in that connection
we must bear in mind that the question before us is not
what this court would do or believe if we heard the
witnesses as a trial court. It is useless to speculate on
that point since this court exists for the correction of
errors of law, not for the correction of errors of fact.
The question before us is as to whether or not the trial
court was compelled to believe the physicians who testi-
fied as experts that (a) the testatrix at one time be-
came obsessed with an insane delusion not based on
facts, and (b) that the insane delusion was incurable
and virulent many years later when the testatrix made
her will, so as to make her incapable of executing it,
and this, in the face of undisputed testimony that, while
not wanting to have anything to do with her relations,
the testatrix for at least a quarter of a century before
she died, including the time of the execution of the will,
acted as a normal human being, one fully able to man-
age her property carefully and enjoying life perhaps

more fully than her fellowmen on account of her tastes. For answer to these questions we must look to the decisions of the courts. These are numerous and, so far as we have found, unanimous. We need not dwell long on the testimony of Dr. Stewart, who never saw the testatrix, who testified from what he had heard in court, and whose testimony, therefore, is similar to one who testifies pursuant to hypothetical questions. Such testimony has been held to be "of the weakest and most unsatisfactory sort." In Re Miller's Estate, 10 Wash. 2d 258, 116 Pac. 2d 526; In Re Bottger's Estate, 14 Wash. 2d 676, 129 Pac. 2d 518; Moore vs. Moore, 290 Ky. 715, 162 S. W. 2d 547. 32 C. J. S. 404. The reasons are fully explained in Moore vs. Moore, supra. In cases where the testimony of medical experts is based on knowledge, observation or treatment, it may be given more weight than the testimony of unprofessional witnesses, but such testimony is seldom, if ever, conclusive. Laymen, too, are competent witnesses when they relate the facts on which their observations are based, and the weight to be attached to the testimony of expert as well as nonexpert witnesses is for the trier of facts. 32 C. J. S. 172, 382 to 383, 402 to 404. In Sapp vs. Lifrand, 44 Ariz. 321, 36 Pac. (2d) 794, 796, the court said:

"The physicians whose evidence was offered by intervener testified substantially that Malich at the time he made the assignment was in an abnormal state mentally and not in a condition to transact any important business. On the other hand, a number of lay witnesses testified that in their opinion he was competent for that purpose.

"It is urged that the court was bound to consider the testimony of the physicians as conclusive on this point. We are cited to no authorities supporting this contention, and it seems to us obviously unsound. If the opinion of the physicians is conclusive upon a matter of this kind, there is no reason why lay testimony on the sub-

ject should be admitted at all, yet it is universally held that such testimony is proper."

In Nelon vs. Nelon, 171 Ark. 505, 284 S. W. 743, the court stated:

"At the outset, it may be stated that the weight to be given to the opinions of witnesses testifying as experts is always a matter to be determined by the jury, from all the circumstances appearing in evidence, and it would be error for the court to intimate to the jury that the testimony of medical experts would be entitled to greater weight than that of the other witnesses. Jenkins v. Tobin, 31 Ark. 306, Maclin v. State, 44 Ark. 115, and Hogue v. State, 93 Ark. 316, 124 S. W. 783, 130 S. W. 167."

In Weber vs. Della Mountain Mining Co., 14 Idaho 404, 94 Pac. 441, 444, the court stated:

"It is too well settled law to require consideration or discussion here that the competency or incompetency, sanity or insanity, of a person at the time of a given transaction may be proven by laymen or nonexpert witnesses with equal certainty, and often greater satisfaction than by experts, and the fact that a witness who has been acquainted with the person and has seen him frequently, and has been familiar with all his transactions, and has had business dealings with him, is himself not an expert on the subject of insanity, and is not versed in the medical science or has had no training or education along those lines, is no reason whatever for excluding his evidence on a question of common, everyday observation. Kelly v. Perrault, 5 Idaho, 221, 48 Pac. 45; Heirs of Clark v. Ellis, 9 Or. 128; In re Christiansen's Estate, 17 Utah, 42, 53 Pac. 1003, 41 L. R. A. 504, 70 Am. St. Rep. 794; People v. Wreden, 59 Cal. 394; Armstrong v. State, 30 Fla. 200, 11 South. 618, 17 L. R. A. 484. A nonexpert may be as able as an expert to make clear mental comparisons between the acts and conduct of a man who was at a given time sane, sound, and perfectly competent, and his acts at a time when he was laboring under mental disabilities."

In Clark vs. The State of Ohio, 12 Ohio 483, 489, 40 Am. Decisions 481, the court said:

"Insanity is a disease of the mind; and physicians, with all the science they possess, are as yet like the masses of mankind ,without any certain knowledge of the nature of the thing disordered. They know, and all men know, that mind exists. By the results it produces in a healthy state, all men have equal evidence that it is; but what it is, how to fathom, span or define its nature, is what we lack direct facts and analogies to enable us to do. Philosophers and physicians are here upon a level with the common masses of our race, and if wiser upon the subject it is because they have been more astute and attentive observers. Every one who associates with his species, acquires, daily, correct knowledge of the natural operations of the human mind, and a capacity to form an opinion, if there should happen to be an abberation from the path of sanity, in any of his constant associates. The ability to form a just conclusion will depend much upon his native intelligence and accuracy of observation."

It is quite apparent from these authorities and many more that could be cited that the trial court had the right to rely upon the testimony of the witnesses for the proponents of the will, the knowledge of some of whom went back to the decade between 1910 and 1920. Even if it were conceded—which need not be—that the testatrix was insane in 1918, the trial court had the right under the foregoing authorities to hold that the presumption arising therefrom was dissipated and overcome by the testimony showing that the testatrix was of sound mind when she executed her will. We are unable to see how we could do anything except to affirm the judgment, and it is, accordingly, so ordered.

RINER, C. J., and KIMBALL, J., concur.